Filed 12/11/15

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>OSCAR JIMENEZ,<br><br>    Defendant and Appellant. | F067846<br><br>(Super. Ct. No. BF138106A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Eric J. Bradshaw and John R. Brownlee, Judges.†

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Peter W. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III., V., VI., VII., VIII., and IX. of the Discussion.

† Judge Bradshaw presided on April 2, 2013; Judge Brownlee presided over all other hearings pertinent to this appeal.

On August 17, 2011, defendant Oscar Jimenez was indicted on two counts of second degree murder (Pen. Code, § 187, subd. (a)[1] [counts one-two]), two counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a) [counts three-four]), and one count of driving with a suspended license (Veh. Code, § 14601.4, subd. (a) [count five]).

In connection with counts one through four, the indictment alleged defendant was previously convicted of (1) first degree burglary—a qualifying strike under the "Three Strikes" law (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e)) and a serious felony (§ 667, subd. (a))—on or around March 9, 1992, for which he served time in prison (§ 667.5, subd. (b)); (2) possessing a controlled substance on or around June 6, 2006, for which he served time in prison (*ibid.*); (3) possessing a controlled substance on or around October 27, 1998, for which he served time in prison (*ibid.*); (4) possessing a controlled substance on or around March 1, 1996, for which he served time in prison (*ibid.*); and (5) possessing a narcotic on or around April 14, 1989, for which he served time in prison (*ibid.*).

In connection with counts three and four, the indictment alleged defendant had been convicted of driving under the influence (DUI) on May 10, 2002, and August 11, 2009, respectively. (§ 191.5, subd. (d).) As to count five, it alleged he was previously convicted of (1) driving with a suspended license on or around April 10, 2006 (Veh. Code, § 14601.2, subd. (d)(2)); and (2) driving with a suspended license on or around August 11, 2009 (*ibid.*).

On May 23, 2013, the jury convicted defendant on all counts and found true the allegations of his earlier DUI convictions on counts three and four. In a bifurcated proceeding, the trial court did not issue a finding as to the allegation of being convicted

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

of driving with a suspended license on or around August 11, 2009, on count five, but found true all remaining allegations.

On August 6, 2013, defendant was sentenced to 30 years to life, plus five years for a prior serious felony conviction and four years for four prior prison terms,[2] on count one; 30 years to life, plus five years for a prior serious felony conviction and four years for four prior prison terms (see *ante*, fn. 2), on count two, to be served consecutively; and 180 days in jail on count five, to be served concurrently. The trial court also imposed 30 years to life, plus five years for a prior serious felony conviction and four years for four prior prison terms (see *ante*, fn. 2), on counts three and four, respectively, but stayed execution of these sentences pursuant to section 654.

On appeal, defendant contends the evidence did not establish he was under the influence of a drug (counts three-four) or killed with malice aforethought (counts one-two); claims the trial court erred by refusing to instruct the jury on unconsciousness, denying his motion to suppress blood test results, and admitting into evidence a detective's opinion about his state of intoxication, other-crimes evidence, and his mug shot profile; alleges various sentencing errors; and asks us to review the sealed reporter's transcript of the trial court's April 2, 2013, in-camera hearing and determine whether the trial court properly ruled on his motion for discovery pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

In the published portion of the opinion, we conclude substantial evidence established defendant was under the influence of a drug, substantial evidence established implied malice, and defendant's blood test results were not subject to exclusion. In the unpublished portion of the opinion, we conclude an instruction on unconsciousness was unwarranted, the trial court did not abuse its discretion when it admitted a detective's

---

**2** A fifth prior prison term enhancement was stricken because the offense underlying this enhancement—i.e., first degree burglary—was also the basis for the prior serious felony enhancement.

opinion regarding defendant's state of intoxication or when it admitted other-crimes evidence, the admission of defendant's mug shot profile did not constitute prejudicial error, one sentencing error must be corrected, and the trial court did not abuse its discretion when it determined certain peace officers' records contained no discoverable materials.

## STATEMENT OF FACTS

### I.      Prosecution case.

On April 26, 2011, at approximately 9:00 a.m., Maria Rocha heard a loud collision while she was in her residence at 2701 Sierraglen Court in Bakersfield. Through a bedroom window, she saw a gray truck—which had plowed through a fence—in her backyard. Rocha's son called 911. Meanwhile, Rocha entered the backyard and observed defendant emerging from the driver's side of the vehicle. As he ran westward on Auburn Street, she warned, "Hey, don't run. I've already called the cops." Rocha believed defendant "was trying to get away."

At 9:11 a.m., Detective Kevin Fidler arrived at the scene of the accident. He spotted Albert Cichy lying near the truck, Annabelle Cichy lying on the northeastern corner of Sierraglen Court and Auburn Street, defendant sitting on the curb close to Annabelle,[3] and an upended fire hydrant. After Fidler recruited bystanders to stabilize the Cichys until the arrival of emergency medical services, he spoke to defendant.

Defendant told Fidler he was driving eastbound on Auburn Street between 35 and 40 miles per hour when he was cut off by another vehicle, which forced him to swerve and hit the fire hydrant and the Cichys. He was also "coming down off of speed.[4]" Defendant then mentioned he had "blacked out" until he crashed into the hydrant. He

---

**3**      To avoid confusion, we identify individuals who share the same surname by their first names. No disrespect is intended.

**4**      At trial, Fidler specified "speed" was "a common term for methamphetamine."

4.

admitted having a suspended driver's license. When Fidler asked why the license was suspended, defendant answered, "For a DUI." Defendant "appeared nervous and jittery," "had an accelerated, mumbled speech," and "show[ed] signs of bruxism," i.e., "consistent" "clench[ing]," "twitch[ing]," and/or "thrust[ing of] the[] jaw …." In view of defendant's remarks and actions, Fidler opined defendant was "impaired by methamphetamine."

Officer Patrick Dillard, a vehicular accident reconstructionist, charted the truck's path of travel. The areas of impact, in sequence, included (1) the curb on the northwestern corner of Auburn Street and Sierraglen Court; (2) a "No Parking Any Time" sign; (3) the fire hydrant; (4) the Cichys; (5) the curb on the northeastern corner of Auburn Street and Sierraglen Court; (6) the street name signs for Auburn Street and Sierraglen Court; (7) a tree; and (8) the fence bordering Rocha's backyard. Dillard did not notice any skid marks or other evidence of braking.

Officer Scott Lazenby inspected the truck and found no mechanical issues with the steering mechanism, brakes, and tires. He surveyed the road and confirmed there were no objects that would have prompted defendant to abruptly change direction. The weather, which was clear and dry, was also excluded as a contributing factor. Inside the pocket in the driver's side door, Lazenby retrieved an eyeglass case, which was inscribed with defendant's last name and contained a glass pipe with methamphetamine residue.

At the scene of the accident, emergency medical services measured defendant's heart rate twice at 9:33 a.m. and 9:41 a.m., respectively. In both instances, the rate was at or below 90 beats per minute. Defendant was then transported to Kern Medical Center. Officer Jeffrey Paglia, who was present during intake, heard a nurse ask defendant "why he's shaking" and defendant say "he was withdrawing from methamphetamine." Dale Robbins, a physician assistant, was informed of defendant's "altered mental status"[5] by

---

**5** Robbins testified an altered mental status constituted "some disturbance in orientation, either to person, place, time, or surroundings, which is indicative of either an

5.

the paramedics. At approximately 9:50 a.m., Robbins evaluated defendant, who was "alert," "verbally responsive," and "oriented to person, place, time, and surroundings …." Aside from a slightly elevated blood pressure, vital signs were normal. Defendant was hydrated and his mouth was "normal." In both eyes, he presented "small and mildly reactive" pupils and nystagmus, i.e., "fluttering of the eye movements," signifying an injury to the central nervous system and/or intoxication. He also presented "twitching" of the extremities and dysphasia, i.e., "difficulty speaking." A computed tomography scan of the brain was inconclusive. At 10:00 a.m., upon Paglia's request, a nurse drew blood from defendant's right arm. Paglia had not asked defendant for consent.

On April 28, 2011, an initial test of defendant's blood sample at the Kern County Crime Laboratory was positive for amphetamine and marijuana. On April 29, 2011, a confirmatory test found 0.2 micrograms per milliliter (µg/ml) of amphetamine and 0.44 µg/ml of methamphetamine. Additional analysis on June 14, 2011, detected 2.0 nanograms per milliliter (ng/ml) of delta-9-tetrahydrocannabinol (THC), the "parent compound in marijuana." According to Thomas Sneath, the toxicologist who tested the blood sample for marijuana, delta-9-THC is "only [in the circulatory system] for a few hours" following ingestion.

In the wake of the April 26, 2011, accident, Albert died due to multiple blunt force injuries and Annabelle died due to complications stemming from blunt force trauma.

At trial, the prosecutor indicated he would introduce evidence "of [defendant's] prior arrests or convictions … and things that he may have learned during the course of those arrests and convictions." The trial court preemptively instructed the jury:

> "During the trial certain evidence will be admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. You may consider the evidence that [defendant] has allegedly been

injury to the central nervous system or intoxication with sometimes alcohol or substance."

previously arrested and charged with [DUI] for the limited purpose of determining the following:

"Number one, whether or not at the time he acted he knew his act was dangerous to human life and he deliberately acted with conscious disregard for human life. [¶] This is relevant to the implied malice counts in Counts 1 and 2.

"Number two, whether or not he acted with gross negligence in Counts 3 and 4.

"Number three, whether or not he suffered the alleged [DUI] convictions as alleged in … section 191.5(d), allegations as to Counts 3 and 4.

"And number four, whether or not he had a suspended or revoked driver's license in Count 5.

"If you have a reasonable doubt that [defendant] learned from his prior conduct that that conduct was dangerous to life, you must disregard the evidence of that prior conduct.

"You must determine whether [defendant] knew that his conduct was dangerous to human life at the time of the present offense.

"You may not consider any evidence of prior incidences of [DUI] as evidence of [defendant's] bad character, criminal record, or violation of any laws."

The parties agreed to the following stipulations:

"On … June 8th, 2009, … [defendant's blood] sample screened positive for amphetamines and marijuana. The sample was not confirmed. The sample was later destroyed after [defendant]'s 2009 court case had concluded.

"… [D]efendant was arrested in March of 1987 and convicted in June of 1987 of … alcohol [DUI] in Pasadena, California. He received two days in jail, three years probation, and his license was suspended.

"… [D]efendant was arrested and convicted of … alcohol [DUI] in Kern County in December of 1988. He was sentenced to 45 days in jail, three years probation, and his license was suspended.

"… [D]efendant was arrested and convicted of … alcohol [DUI], Vehicle Code [s]ection 23152(a), in Kern County in March of 2002. He received 30 days jail, three years probation, and his license was suspended."

Roderick Frye formerly directed WestCare California's residential substance abuse treatment program, which incorporated lectures, seminars, and video presentations on the consequences of drug use in certain scenarios, e.g., ingesting methamphetamine and driving. In 2008, defendant completed the program in approximately 90 days. Frye testified an individual could not "go through that 90-day program and not have that idea presented … that … methamphetamine [DUI] could result in somebody dying."

On June 4, 2009, at about 1:15 a.m., California Highway Patrol (CHP) Officer Michael Phillips saw defendant nearly sideswipe another vehicle with his truck at an intersection in Bakersfield. Phillips followed defendant—who "was weaving consistently, going in and out of his lane"—and initiated a traffic stop. Defendant was "extremely fidgety," slurred his speech, displayed constricted pupils, and had a heart rate of 104 beats per minute. He failed the field sobriety tests. Defendant admitted taking methamphetamine "a couple of days prior." Roughly 45 minutes later, CHP Officer Kelly Walker, a drug recognition expert, evaluated defendant at Kern County Jail. Defendant was "lethargic," had "droopy" eyelids and a "slack" face, "struggl[ed] to stay awake," and spoke "quickly" and "quietly." His pupils were 2.0 millimeters (mm) in "normal room light," 2.5 mm in "near darkness," and 2.0 mm "with a pen light … direct[ing] light in[to] his eye[s.]" Defendant's heart rate fluctuated between 64 and 72 beats per minute. He also exhibited "a thick white coating on his tongue [and/]or in his oral cavity" and injection marks "[i]n the bend of his right arm."

On August 11, 2009, defendant pleaded nolo contendere to drug DUI, inter alia. Pursuant to Vehicle Code section 23593, subdivision (a), he received the following judicial admonition:

"You are hereby advised that being under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, you can be charged with murder." (Some capitalization omitted.)

James Rabuse was defendant's substance abuse counselor at Turning Point Kennemer Center, where defendant participated in another residential substance abuse treatment program from January 29, 2010, to July 23, 2010. The program addressed, inter alia, "the possible legal ramifications stemming from … being a reckless driv[er] to a driv[er] under the influence." In response to a written question about whether his substance abuse endangered the lives of others, defendant answered, "I've driven while under the influence for starters." He successfully completed the program in six months. Rabuse "could not see any reason why [a person going through the program] wouldn't be able to understand" "that using a drug, [like] methamphetamine, and driving could result in somebody dying." On cross-examination, he testified a person "should" be able to operate a motor vehicle "[e]ight to 12 hours … after the last ingestion of [methamphetamine]," "even though the period of time where [the drug] shows up in the blood might not have lapsed," and he offered this advice in "one-on-ones" and "group counseling." On redirect examination, Rabuse conceded he did not know "what is a safe amount of methamphetamine to have in your blood to drive," adding "[i]t depends on the individual and how much [he] ingested prior to."

Dr. Barry Logan, a forensic toxicologist, identified two phases of methamphetamine intoxication. In the first phase, also known as, the "excited" phase, the user is alert, energetic, and euphoric. Common signs include an elevated pulse and blood pressure, dilated pupils, jumbled and/or accelerated speech, tics, twitching, bruxism, and other fidgety behavior. In the second phase, also known as, the "crash" or "withdrawal" phase, the methamphetamine has disseminated throughout the user's body,

9.

diluting the initial stimulative effects. As a result, the user—who had originally been invigorated by the drug—experiences depression, fatigue, and sleepiness, cannot concentrate, reacts slower, and craves further methamphetamine ingestion to "feel better again." The pulse and blood pressure return to normal and the pupils sometime constrict.[6] Marijuana is often consumed to offset the effects of the "crash" phase. Logan added:

> "[I]t's basically a continuum of effects. So you start with the excited phase or the initial intoxication phase, and then as those effects start to wear off, the effects of withdrawals start to appear. It's not like you hit a switch and you go from one phase to the other. There's some overlap in terms of the symptoms. [¶] … [¶] … As you start … to come down from the effects of the drugs, you still have some of your residual excitatory effects, but the adverse effects, the tiredness, the fatigue, the somnolence, these start to become more prominent. So … you can have both effects at the same time."

In a study of methamphetamine DUI cases, Logan found the methamphetamine concentration ranged between 0.05 and 2.5 µg/ml. Defendant's blood sample contained 0.44 µg/ml of the drug, which was "consistent with abuse" rather than "therapeutic use." Logan then explained how defendant's methamphetamine concentration at the time of the blood draw was a "pretty good estimate of what it was at the time of driving":

---

[6]     Regarding pupillary response, Logan detailed:

> "[T]he kind of pupillary restriction you see with opiates is … pupils become constricted or very small, maybe as small as [1.0 mm] and they become fixed so that when you change the lighting conditions, you cover someone's eyes, and when your pupils would normally open, your pupils don't change at all.
>
>     "In cases of people on the downside of methamphetamine, when you change lighting conditions like that, their pupils typically are a little more reactive to light. So that's one of the ways … [to] distinguish people on illegal narcotics, analgesics [from] people on the downside of methamphetamine or stimulant use."

"[D]rugs have a property called half[-]life.… [I]f you have a concentration of a drug in your blood right now that's [100], and the half[-]life of a drug is in an hour, then an hour later, instead of having [100], you would have 50. [¶] And then an hour [after] that, that 50 would have again fallen in half to 25. [¶] So over time, the drug concentration is going to decline.

"The half[-]life o[f] methamphetamine … varies from person to person. It's between probably eight and 12 hours. [¶] So [after] eight to 12 hours … the concentration would fall by half. [¶] So over a period of an hour, the amount of change in the blood concentration would be quite small.

Based on percipient witnesses' statements about defendant's appearance and conduct at the crime scene (i.e., "excited, accelerated speech," "fidgety,") and hospital (i.e., "muscle tremors and shakes"), defendant's abnormal driving behavior (i.e., "los[ing] control of his vehicle, cross[ing] several lanes of traffic, mount[ing] a curb, hit[ting] a number of fixed objects with no apparent effort to brake or to prevent hitting the[m]," "collid[ing] with the victims"), defendant's admission he was "coming down from speed," medical records, and the blood test results, Logan opined defendant fell asleep at the wheel due to methamphetamine withdrawal on April 26, 2011. He reiterated defendant's impairment was caused by methamphetamine intoxication:

"[M]y view of methamphetamine intoxication is that it doesn't stop with somebody as soon as somebody reaches their peak and enters the downside. Intoxication is … the effect on an organism, a cell, a human being, an animal, as a result or consequence of their ingestion of a drug or alcohol. [¶] … [¶] So … that process [of] somebody … reaching their peak, start[ing] to come down, all of that, in my view, would be intoxication."

## II. Defense case.

Teresa Jimenez testified defendant, her husband, "sle[pt] a full night's sleep" on each of the three nights preceding the morning of April 26, 2011. On the night of April 25, 2011, he "seemed normal" at bedtime. The following morning, defendant was "normal," "didn't seem[] tired," and "wasn't" "high." On cross-examination, Teresa acknowledged defendant had used methamphetamine for years, had prior DUI

convictions, and attended various programs for substance abuse treatment, but rarely observed him in an intoxicated state.

Vincent Jimenez woke defendant, his father, at around 7:45 a.m. on April 26, 2011, to get a ride to the school bus stop. According to Vincent, who had observed defendant in an intoxicated state,[7] defendant was "normal." They left their residence at 6009 Fairfax Road at around 7:55 a.m. En route to the bus stop on the corner of Auburn Street and Fairfax Road, defendant and Vincent talked about the latter's girlfriend troubles and physical training for the Marine Corps. Defendant drove and spoke "normal[ly]." His eyes were also "normal." On cross-examination, Vincent acknowledged defendant had "a problem with methamphetamine." In addition, he admitted telling either defense counsel or defense counsel's investigator he believed defendant was under the influence on the night of April 25, 2011, when he and defendant were "fixing a bumper on the truck" together.

Norma Jimenez saw defendant, her brother, at her residence near Bakersfield Memorial Hospital at or around 8:10 a.m. on April 26, 2011. He had visited to perform automotive work. However, Norma postponed the appointment because she needed to leave for her community college class by 8:30 a.m. Defendant was "acting fine," but appeared "somewhat tired." He stayed at Norma's home for five minutes at most.

Arthur Espinoza knew defendant through Maylean Jimenez, defendant's eldest daughter. On April 26, 2011, at or around 8:15 a.m., he encountered defendant in the parking lot of his apartment complex at 3901 Q Street. Defendant "persisten[tly]" asked Espinoza to "sell a camera for him," but Espinoza was busy. According to Espinoza, who formerly used methamphetamine and recognized symptoms of methamphetamine intoxication, defendant was "clean and sober."

---

**7**    Vincent specified defendant would not sleep for several days, exhibit dilated pupils, have a short attention span, and hum songs.

William Sommers—a retired sergeant in the Ontario Police Department, experienced traffic accident investigator and reconstructionist, and drug recognition expert—reviewed the police and medical records and concluded defendant's driving was not related "in any way to the use of drugs." He testified:

> "Since [methamphetamine]'s a central nervous system stimulant, when the person is under the influence of it, everything in the central nervous system is speeded up. Body temperature. There may be piloerection…. [¶] These things won't be present to a large degree or at all if a person is on the downhill side of it …. [¶] … [¶]

> "… I looked at the clinical signs. I looked at the fact that everywhere I looked it said normal, normal, normal. Everywhere you went, to the blood pressure, his pulse, all were within normal limits. Even when he was admitted to the hospital his pulse was … in normal limits."

Sommers also inspected defendant's truck, which had a rear-wheel anti-lock braking system. Consequently, he expected front-wheel skid marks at the accident scene. The absence of such marks suggested defendant either (1) applied the brakes "to the point just short of lock-up"; or (2) did not apply the brakes at all. Based on a mathematical formula, Sommers determined defendant drove between 31 and 49 miles per hour.

On cross-examination, Sommers conceded the blood test results revealed "a non-therapeutic value of … methamphetamine." He disregarded defendant's admission of "coming down from speed" because "[it]'s not a clinical sign." Sommers did not recall Robbins' notes about defendant's twitching and dysphasia. However, such symptoms could be attributed to defendant "[j]ust being excited, having been involved in a traffic collision …." Additionally, bruxism may be "one of the symptoms of methamphetamine use, but … is not in and of itself an indicator that [one is] under the influence of it." As for the reason behind defendant's erratic driving, Sommers remarked:

> "There are no clinical signs to show that [defendant] was impaired. I can't say that he was under the influence of methamphetamine. I can say that he was under the influence of tired. Now, I can't tell you why he was tired,

but I can tell you that the clinical signs … do not reflect methamphetamine use or any other central nervous system stimulant. [¶] … [¶]

"A person who is under the influence of a central nervous system stimulant is not going to go to sleep. They are … stimulated. Heart rate[']s up, breathing's up, temperature's up, hydration is down. [¶] There are a lot of things that are going on, but one of them is not sleeping."

Felix D'Amico—a retired sergeant in the San Bernardino County Sheriff's Office and drug recognition expert—testified methamphetamine "only lasts six to eight hours normally," but "increase[s] … to maybe 12 hours" if smoked. He reviewed the police and medical records[8] and opined defendant was not under the influence of methamphetamine or any stimulant derivative at the time of the accident:

"[T]he behavioral statements that were made about [defendant] could have matched methamphetamine or amphetamine [use], [e.g.,] being excitable, nervous, things like that, [but the observations were made] right after a major accident, so I kind of have to discount th[em]. I want to get more into clinical things. [¶] … [¶]

"… [I]f he was actually under the influence, [his pupils] should [have] be[en] somewhere between [7.0] and [9.0] m[m], and the light [should] not [have] affect[ed] it…. [¶] The drug … take[s] over the pupil size and it will not move. [¶] … [¶] … It's a dead give-away right there. The only two drugs that we know [will do that] are stimulants and hallucinogenics …."

"[R]oughly between nine o'clock and whenever he was transferred to the hospital, they took [multiple] pulses on him. And he was in the high normal range…. [¶] … [U]nder the influence [of methamphetamine and stimulant drugs,] you're going to be way up over 120 [beats per minute]. [¶] … [¶]

"[Methamphetamine] is … basically like taking cold medicine…. [I]t dehydrates you. It dries you up. [¶] … [W]hen you get dehydrated, your tongue swells up and you have a white coating on the tongue …. If you have a white coating on your tongue, that's kind of a dead give away.

---

[8]     D'Amico "[s]uperficially" scanned Dillard's findings because he was "not a traffic accident reconstructionist."

> "But here again, I read records where trained medical personnel said he was hydrated. Not dehydrated, hydrated. So that's another thing that leads me to believe that he was not under the influence of the classic sense of being impaired at that time."

According to D'Amico, the blood test results merely showed "methamphetamine had been in [defendant's] system in the past." He maintained "it [was absolutely] possible to have methamphetamine still lingering in [one's] blood and not be under the influence of methamphetamine." Also, "it [was not] possible to look at a level of … methamphetamine in a person's blood and extrapolate retroactively when … he last used methamphetamine."

On cross-examination, D'Amico testified defendant's admissions of "coming down from speed" and "going … through meth[amphetamine] withdrawals" did not change his opinion. He conceded twitching and jaw-loosening movements could be symptomatic of methamphetamine use. The prosecutor hypothetically asked D'Amico whether a person who "claimed to be coming down from methamphetamine use" and "going through methamphetamine withdrawals," "ha[d] trouble speaking," "was excitable[ and] nervous," "ha[d] bruxism," "had a positive drug screen for both methamphetamine and marijuana, [with] methamphetamine in … an abusive level beyond a therapeutic dose," "drove on a sidewalk," struck "street sign[s], a fire hydrant, two people, … [and] trees," and "crashed into a back yard without ever … braking" would be "too impaired to be driving safely." D'Amico responded:

> "Obviously there's impairment there. There's bad driving with a terrible result. There's a lot of behavioral things here. Shaking, speaking. Bruxism …. [A p]ositive … blood test means it was in his system. He told someone that he was coming down…. I don't know if you believe that or not believe that. [¶] But … the clinical [signs] are not there. There's no clinical signs to show that he was under the influence at the time. And that's all I'm trying to say. No doubt, it was bad driving. I have no idea why."

Dr. Todd Zorick, a psychiatrist specializing in addictive disorders, testified "the criteria for methamphetamine intoxication are entirely clinical, [i.e.], observations and

15.

self report[ing]."  Blood test results are not considered "because there's no strict …, one-to-one correlation between the level of a blood test and someone's level of [methamphetamine] intoxication."  To illustrate, Zorick compared methamphetamine with alcohol:

> "[A]lcohol is metabolized very, very rapidly, so it's very clear when someone has a certain level of alcohol in their blood.  That very closely correlates with [his] behavioral performance.  And then the next day alcohol is completely out of [his] system and [he's] back to normal.
>
> "Methamphetamine and most other drugs of abuse have much longer half[-]lives[9] and tend to stay around … in the body a lot longer.  [¶]  So even though [users] might not be under the acute influence of that substance, they wouldn't exhibit the signs and symptoms, they continue to have body fluid testing which will reveal the presence of recent drug use or sometimes even more long lasting drug use."

Zorick reviewed the police and medical records and concluded "it's unlikely that [defendant] was intoxicated with methamphetamine at the time of the accident."  He clarified:

> "What I discovered was that as few as 25 minutes after the incident, [defendant's] blood pressure and pulse were reported to be in the normal range ….  [¶]  And that was consistent … throughout the course of his hospitalization that day.  [¶] … [¶]
>
> "… [R]eports from the emergency medical service and from the hospital where he was evaluated … indicated that he had normal reflexes, that he had no pupillary dilation, that he didn't seem to have any other abnormal physical signs that would indicate that he was intoxicated with methamphetamine.  [¶] … [¶]
>
> "So to me it's curious that, you know, he didn't have any sort of response over the extended period of time that he was evaluated during this day that would indicate that he was intoxicated with methamphetamine.  [¶] … [¶]

---

**9**     Zorick testified the average half-life of methamphetamine is 12 hours, after which "the phase of intoxication would be over …."

"… [I]f he had been intoxicated with methamphetamine, let's say he had used methamphetamine within the last two hours or so prior to the accident, that should have been reflected in having elevated blood pressure, an elevated pulse rate, having dilated pupils, perhaps … other behavioral abnormalities, an abnormal mood, having some physical symptoms, for example, anxiety, nausea or having recent weight loss, that would have indicated that he was likely intoxicated with methamphetamine."

As for the reason behind defendant's erratic driving, Zorick—without offering a "firm diagnosis"—surmised the "likely cause" was "falling asleep." Sleepiness could not be attributed to methamphetamine intoxication, however, since a person under the influence of methamphetamine would be "wide awake."

On cross-examination, Zorick listed symptoms of methamphetamine withdrawal, including fatigue, hypersomnia, loss of concentration, dysphoria, depression, and anxiety. Even though he "did not diagnos[e] or feel that [defendant] met criteria for methamphetamine withdrawal," he still concluded "the weight of all the evidence … makes it more likely than not that [defendant] fell asleep while driving the morning of April 26th, 2011, while experiencing fatigue and sleepiness of methamphetamine withdrawal[,] resulting in the crash."

Dr. David Krauss, a cognitive neuroscientist, testified a warning "needs to change the [perceiver's] behavior" to be effective. Factors that "increase the likelihood that a warning will work" relate to either "the warning itself" or "the person receiving that information." Krauss scrutinized the judicial admonition read to defendant on August 11, 2009. (See *ante*, at pp. 8-9.) He deemed the admonition ineffective because, inter alia, (1) it did not provide "new" information (i.e., defendant "already … knew what the hazard was" because he was in a courtroom); (2) it did not specifically address "driving many hours after ingesting narcotics"; and (3) defendant was already inclined to disregard it because he "ha[d] driven many times under the same circumstance without a negative outcome" and "perceive[d] that the next time [wa]s going to be safe."

17.

On the other hand, Krauss believed Rabuse's advice (see *ante*, at p. 9) was more effective than the judicial admonition on the basis of "source credibility":

"If you're given just a passive warning or a passive admonition, … if you're reading sort of a []rote instruction that is a generic that's given to every person that passes through the court under these conditions, that's going to have some level of merit associated with it.

"If you're then in a drug rehab facility where you're presumably working with people who are trying to better your situation, are trying to make you write specifically not to do what got you in there, and they give you an instruction[, t]hat instruction that is direct[ed] solely to you by somebody who is specifically there to make sure you don't do what you did again is likely going to carry a lot more weight."

## DISCUSSION

### I. Substantial evidence established defendant was under the influence of methamphetamine.

a. *Standard of review.*

"To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955 (*Tripp*).) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755 (*Redmond*).) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' [Citation.]" (*Tripp, supra*, at p. 955, italics omitted.)

"This standard of review … applies to circumstantial evidence. [Citation.] If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also

18.

reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.  [Citations.]"  (*Tripp*, *supra*, 151 Cal.App.4th at p. 955.)

"Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it."  (*Redmond*, *supra*, 71 Cal.2d at p. 755.)  "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'  [Citation.]"  (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

     b.  *Analysis.*

The record indisputably shows that on the morning of April 26, 2011, defendant lost control of his truck while driving eastbound on Auburn Street, veered toward Auburn Street and Sierraglen Court, and—without braking— struck Albert and Annabelle as well as several fixed, inanimate objects, e.g., a fire hydrant, tree, fence, and various street and traffic signs.  The truck had no mechanical issues, and external factors such as road debris and the weather did not play a role in the accident.  On appeal, defendant concedes he fell asleep at the wheel and ingested methamphetamine "a day to three days earlier."  Nonetheless, he contends "there was no substantial evidence of [methamphetamine] intoxication while driving."  We disagree.

"Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of [s]ection[s] … 23152 [DUI] or 23153 [DUI and causing bodily injury to another person] of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence,

19.

or the proximate result of the commission of a lawful act that might produce death, in an unlawful manner, and with gross negligence." (§ 191.5, subd. (a).)

"A person is under the influence [of methamphetamine] … when, as a result of using methamphetamine, his physical or mental abilities are impaired to such a degree that he no longer has the ability to drive his vehicle with the caution characteristic of a sober person of ordinary prudence under the same or similar circumstances." (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1194.) "Whether [a] defendant was 'under the influence' [i]s a question of fact for the jury to determine from all the proven circumstances of the case." (*Ibid.*)

We conclude any rational jury could find—beyond a reasonable doubt—defendant was under the influence of methamphetamine while driving on April 26, 2011. The record—viewed in the light most favorable to the prosecution—shows he had smoked the drug at some point before the accident. Vincent, defendant's son, recognized alertness and dilated pupils, inter alia, as signs of methamphetamine use. Expert witnesses for the prosecution and the defense corroborated these physical traits are such indicia. Vincent—proven to be acquainted with the aforementioned symptoms—believed defendant was in a state of intoxication while they were repairing the truck's bumper on the night of April 25, 2011. A subsequent search of this vehicle uncovered defendant's glass pipe, which contained methamphetamine residue.

On April 26, 2011, less than an hour before the accident, defendant was "somewhat tired." Approximately 10 minutes after the accident, he was "nervous and jittery," "had an accelerated, mumbled speech," "show[ed] signs of bruxism," and confessed to a detective he had "blacked out" and was "coming down off of speed." Defendant's heart rate at the scene was normal. Later, at the hospital, he was seen "shaking," which he attributed to "withdrawing from methamphetamine." During the physician assistant's evaluation, defendant presented "small and mildly reactive" pupils, "twitching" of the extremities, and "difficulty speaking," but otherwise exhibited normal

vital signs. According to Logan, a forensic toxicologist, defendant's accelerated speech, twitching, bruxism, and other fidgety behavior were indicative of the "excited" phase of methamphetamine intoxication while his fatigue, mildly reactive pupils, and normal vital signs were indicative of the "crash" or "withdrawal" phase. Logan testified these phases constitute a "continuum" rather than discrete intervals; thus, overlapping symptoms are not unusual.

Testing of defendant's blood sample—taken within an hour of the accident— revealed a methamphetamine concentration of 0.44 µg/ml. This amount, which was "non-therapeutic" and "consistent with abuse," fell within the 0.05-to-2.5 µg/ml range observed by Logan in a study of methamphetamine DUI cases. Also, given the drug's eight- to 12-hour half-life, 0.44 µg/ml was a "pretty good estimate" of defendant's methamphetamine concentration at the time of the accident. Testing also revealed 2.0 ng/ml of delta-9-THC, the principal ingredient in marijuana that only remains in the circulatory system for "a few hours" after consumption. Logan pointed out marijuana is often taken to counteract the adverse effects of methamphetamine withdrawal.

In sum, the night before the accident, defendant—who had smoked a non-therapeutic amount of methamphetamine—was in the first or "excited" phase of intoxication. By the morning of April 26, 2011, he began to exhibit symptoms of the second or "crash"/"withdrawal" phase. Even so, defendant chose to drive his truck. Ultimately, he fell asleep at the wheel, lost control of his vehicle, and ran over the Cichys. Both Logan and Zorick, a psychiatrist specializing in addictive disorders, confirmed sleepiness is a symptom of methamphetamine withdrawal. Defendant experienced sleepiness because he ingested methamphetamine in the first place. Hence, "*as a result of using methamphetamine*" (*People v. Bui*, *supra*, 86 Cal.App.4th at p. 1194, italics added), his "physical or mental abilities [we]re impaired to such a degree that he no longer ha[d] the ability to drive his vehicle with the caution characteristic of a sober

person of ordinary prudence under the same or similar circumstances" (*ibid.*). (Cf. *People v. Mathson* (2012) 210 Cal.App.4th 1297 [prescription sleep drug DUI].)

On appeal, defendant argues he can only be convicted of methamphetamine DUI if his driving impairment stemmed from "the drug itself … *actively* influencing the body …." (Italics added.) In the context of this case, he is likely claiming he cannot be convicted of methamphetamine DUI because his driving impairment, i.e., sleepiness, was induced by withdrawal. As supporting authority, defendant cites the following excerpt from *People v. Canty* (2004) 32 Cal.4th 1266, 1278 (*Canty*), italics omitted:

> "[F]or a defendant to be guilty of driving while under the influence of drugs …, '"the … drug(s) must have so far affected the nervous system, the brain, or muscles [of the individual] as to impair to an appreciable degree the ability to operate a vehicle in a manner like that of an ordinarily prudent and cautious person in full possession of his faculties. [Citations.]"' [Citations.]"

To the extent defendant suggests *Canty* categorically prohibits drug DUI convictions where the driver's impairment was brought about by drug withdrawal, we disagree. In that case, the defendant—who pleaded guilty to transporting methamphetamine, a felony, and methamphetamine DUI, a misdemeanor—asked the trial court to be placed on probation and diverted to a drug treatment program pursuant to the Substance Abuse and Crime Prevention Act of 2000. (*Canty*, *supra*, 32 Cal.4th at pp. 1272-1274.) Under this law, an offender is eligible for probation and diversion to such a program if he or she has been convicted of a "'nonviolent drug possession offense,'" e.g., "'being under the influence of a controlled substance'" (*id.* at pp. 1272-1273, 1275), but "ineligible … if he or she has been 'convicted in the same proceeding of a misdemeanor not related to the use of drugs'" (*id.* at p. 1273, italics omitted). The trial court rejected the defendant's request because her methamphetamine DUI was a "'misdemeanor not related to the use of drugs'" and the appellate court affirmed. (*Id.* at pp. 1274-1275.)

22.

On appeal before the California Supreme Court, the defendant argued a DUI misdemeanor "should be equated with" the crime of "being under the influence of drugs" because "use of drugs is integral to each offense." (*Canty*, *supra*, 32 Cal.4th at p. 1278, italics omitted.) In rejecting this argument, California Supreme Court emphasized three significant differences between *being* under the influence of drugs and *driving* while under the influence of drugs. First, whereas a person can be convicted of the former merely "by being in that state in any detectable manner" (*ibid.*), he or she can only be convicted of the latter if the drug """"so far affected [his or her] nervous system, the brain, or muscles … as to impair to an appreciable degree the ability to operate a vehicle in a manner like that of an ordinarily prudent and cautious person in full possession of his faculties"""" (*ibid.*, italics omitted). Second, whereas a simple drug-use misdemeanor focuses on "the individual offender's own private involvement with the proscribed substance" (*id.* at p. 1279), a DUI misdemeanor "primarily is concerned not with the offender's use of the proscribed substance, but with his or her use of a motor vehicle" (*ibid.*). Third, whereas the Legislature intended to "protect the user from the consequences … of his or her own conduct" in proscribing being under the influence (*ibid.*, italics omitted), it intended to "protect the public and guard against the threat of injury to others" in proscribing DUI (*ibid.*, italics omitted). The appellate court's judgment was affirmed. (*Id.* at p. 1286.)

At most, *Canty*—for purposes of the Substance Abuse and Crime Prevention Act of 2000—differentiated between two drug-related misdemeanors on the bases of degree of impairment and public policy. *Canty* never intimated an offender cannot be convicted of drug DUI if his or her driving impairment stemmed from drug withdrawal. Furthermore, we are unwilling to countenance this proposition in the instant case. Substantial evidence established defendant smoked methamphetamine and subsequently underwent withdrawal, resulting in somnolence that impaired his driving. We cannot

overlook the fact defendant endured the effects of methamphetamine withdrawal—namely, sleepiness—*precisely because he had used methamphetamine*.[10]

## II.   Substantial evidence established implied malice.

a. *Standard of review.* (See *ante*, at pp. 18-19.)

b. *Analysis.*

"Second degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102, italics omitted; accord, *People v. Superior Court* (*Costa*) (2010) 183 Cal.App.4th 690, 697 (*Costa*).)  "Malice may be either express or implied." (*People v. Lasko* (2000) 23 Cal.4th 101, 107.)  It is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.)  It is implied "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his [or her] conduct endangers the life of another and who acts with conscious disregard for life." (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1215; accord, *Costa*, *supra*, at p. 697.)

"Implied malice is determined by examining the defendant's subjective mental state to see if he or she actually appreciated the risk of his or her actions." (*Costa*, *supra*, 183 Cal.App.4th at p. 697.)  "It is not enough that a reasonable person would have been aware of the risk." (*People v. Moore* (2010) 187 Cal.App.4th 937, 941; see *People v. Olivas* (1985) 172 Cal.App.3d 984, 988 ["[T]he state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't

---

[10]   Defendant curiously—and fallaciously—insinuates this disposition would be akin to imposing culpability on a driver "who voluntarily ingested methamphetamine," "had it wear off until it had no direct adverse effect on driving," and "had an accident due to a heart attack causing a blackout, not due to methamphetamine."

care if someone is hurt or killed.' The state of mind of the person who acts with conscious indifference to the consequences is simply, 'I don't care what happens.'"].) "It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence." (*Costa*, *supra*, at p. 697; see *People v. Nieto Benitez*, *supra*, 4 Cal.4th at p. 110 ["Even if the act results in a death that is accidental, … the circumstances surrounding the act may evince implied malice."].)

Here, substantial evidence established implied malice. The record—viewed in the light most favorable to the prosecution—shows defendant was previously convicted of alcohol DUI in 1987, 1988, and 2002. In 2009, after he nearly sideswiped another vehicle with his truck, he displayed symptoms suggestive of both the "excited" and "crash" phases of methamphetamine intoxication and preliminarily tested positive for amphetamine and marijuana, the latter of which is often taken to offset the adverse effects of methamphetamine withdrawal. Defendant subsequently pleaded nolo contendere to drug DUI and received a judicial admonition pursuant to Vehicle Code section 23593, subdivision (a), which warned: (1) "being under the influence of alcohol or drugs, or both, impairs [the] ability to safely operate a motor vehicle"; (2) "it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both"; and (3) "[i]f [he] continue[s] to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, [he] can be charged with murder."[11] (Some capitalization omitted.) Moreover, in 2008 and 2010, defendant completed two different substance abuse treatment programs, both of which addressed

---

[11] Defendant harps on the wording of the admonition, stressing it "contained no explicit material based upon some phase of withdrawal …." Interestingly, Krauss—the cognitive neuroscientist testifying for the defense—seemed to hint at the futility of editing this wording, having attested to defendant's penchant to ignore such caveats. (See *ante*, at p. 17.)

the potentially fatal consequences of drug DUI.  Indeed, in the course of the 2010 program, defendant acknowledged he endangered the lives of others by driving while under the influence.

Yet, despite several prior brushes with the law, a near-collision in 2009, a straightforward judicial admonition, stints in two separate substance abuse treatment programs, his awareness of withdrawal effects, and his acknowledgement of the risks of DUI, defendant smoked methamphetamine sometime before April 26, 2011, experienced withdrawal on the morning of April 26, 2011, and—with a license revoked on account of his prior DUI conviction—chose to drive anyway.  While driving, he succumbed to sleepiness—a symptom of withdrawal—and killed two pedestrians.  Any rational jury could find—beyond a reasonable doubt—defendant knew his impaired driving endangered the lives of others, but acted "with conscious disregard for life."  (*People v. Dellinger*, *supra*, 49 Cal.3d at p. 1215; accord, *Costa*, *supra*, 183 Cal.App.4th at p. 697.)

On appeal, defendant insists he was advised by Rabuse, his former substance abuse counselor, "th[at] *danger did not exist* if he did not use methamphetamine for eight to [12] hours before driving," which essentially "mooted" the judicial admonition. (Italics added.)  We are not compelled to accept his self-serving interpretation of Rabuse's testimony in light of our obligation as an appellate court to view the record "in the light most favorable to the prosecution" (*Tripp*, *supra*, 151 Cal.App.4th at p. 955) and "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence" (*Redmond*, *supra*, 71 Cal.2d at p. 755).  On cross-examination, Rabuse testified he informed multiple patients—not just defendant—in "one-on-ones" and "group counseling" that a person "should" be able to operate a motor vehicle "[e]ight to 12 hours … after the last ingestion of [methamphetamine]."  On redirect examination, however, he conceded his statement was not intended to be a hard-and-fast rule and was conditioned on both the individual and the amount of methamphetamine consumed beforehand.  It is difficult to envisage how a trier of fact

could construe Rabuse's advice as positively guaranteeing a methamphetamine user will drive unimpaired so long as he or she waits eight to 12 hours after ingestion, irrespective of the user's individualized response and the amount of the drug actually taken. It is equally difficult to envisage how such advice "moots" the substantial evidence of defendant's implied malice.

## III. An instruction on unconsciousness was unwarranted.[*]

a. *Background.*

After the parties rested, defense counsel asked the trial court to give CALCRIM No. 3425, an instruction on unconsciousness.[12] The court denied the request on the basis that "[u]nconsciousness due to voluntary intoxication" "is not a defense to a general intent crime" or "murder," inter alia.

b. *Standard of review.*

"Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that … is … predominantly legal. As

---

[*] See footnote, *ante*, page 1.

[12] CALCRIM No. 3425 reads:

"The defendant is not guilty of _____ <insert crime[s]> if (he/she) acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.]

"Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] _____ <insert a similar condition>).

"[The defense of unconsciousness may not be based on voluntary intoxication.]

"The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious, unless based on all the evidence, you have a reasonable doubt that (he/she) was conscious, in which case you must find (him/her) not guilty."

such, it should be examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733; see *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759 ["A claim of instructional error is reviewed de novo."].)

    c. *Analysis.*

"In a criminal trial, the court must give an instruction requested by a party if the instruction correctly states the law and relates to a material question upon which there is evidence substantial enough to merit consideration." (*People v. Barajas* (2004) 120 Cal.App.4th 787, 791; see §§ 1093, subd. (f), 1127.) "Evidence is substantial if a reasonable jury could find the existence of the particular facts underlying the instruction." (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1426; accord, *People v. Romo* (1990) 220 Cal.App.3d 514, 517.) "'"'In evaluating the evidence to determine whether a requested instruction should be given, the trial court should not measure its substantiality by weighing the credibility [of the witnesses] …. Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. [Citations.]" [Citation.]' [Citation.]" (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.) "Even so, the test is not whether *any* evidence is presented, no matter how weak." (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.) Where evidence is "'minimal and insubstantial,'" the court need not give the requested instruction. (*People v. Lee*, *supra*, at p. 1426.)

"Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417, citing § 26, class Four; see § 29.4, subd. (c) ["Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."].) Correspondingly, "'"[i]f the state of unconsciousness is caused by voluntary intoxication … it is not a complete defense." [Citation.]' [Citation.]" (*People v. James* (2015) 238 Cal.App.4th 794, 805; see § 29.4, subd. (a) ["No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition."].) "Evidence of voluntary intoxication is admissible

*solely* on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought" (§ 29.4, subd. (b), italics added) and "shall not be admitted to negate the capacity to form [other] mental states for the crimes charged, including, but not limited to … knowledge" (*id.*, subd. (a)). (See *People v. Atkins* (2001) 25 Cal.4th 76, 81; *People v. Hernandez* (1988) 46 Cal.3d 194, 209 [evidence of voluntary intoxication inadmissible to negate existence of general criminal intent].)

As previously discussed at length, substantial evidence established defendant was under the influence of methamphetamine. By contrast, there was *no* proof—let alone minimal and insubstantial proof—he used the drug involuntarily. Furthermore, evidence of defendant's voluntary intoxication would have been inadmissible to negate the mental states for each crime charged. Murder under a theory of implied malice is "absen[t] … from the exceptions listed in [section 29.4,] subdivision (b)" (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1300), thus "preclud[ing] evidence of voluntary intoxication to negate implied malice aforethought" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1114). Likewise, gross negligence—an element of gross vehicular manslaughter while intoxicated—"is not one of the mental states listed in section [29.4], subdivision (b) …." (*People v. Carlson* (2011) 200 Cal.App.4th 695, 699, 709.) Finally, section 29.4, subdivision (a), expressly prohibits evidence of voluntary intoxication to negate the capacity to form the mental state of knowledge, an element of driving with a suspended license. (See Veh. Code, § 14601.2, subd. (a).) An unconsciousness instruction would have been unjustified.

Even assuming arguendo the trial court improperly refused to instruct on unconsciousness, under the *Watson*[13] test (*People v. Lee*, *supra*, 131 Cal.App.4th at p. 1429), it is not reasonably probable defendant was prejudiced. At trial, defendant

---

[13]     *People v. Watson* (1956) 46 Cal.2d 818, 836.

asserted he was not under the influence of methamphetamine at the time of the accident and the cause of his somnolence was unknown.  Since CALCRIM No. 3425 cannot be based on voluntary intoxication (*ante*, fn. 12), a viable claim of unconsciousness hinged on whether the jury believed defendant's account.  However, because the jury resolved this question against defendant, defendant's theory of unconsciousness would have been rejected.

**IV.    Defendant's blood test results were not subject to exclusion.**

a.  *Background.*

On May 8, 2013, defense counsel filed a motion in limine to "prohibit[] the [p]rosecution from directly or indirectly identifying to the jury or making any comment of the fact of a blood draw or analysis or of the results of or of any opinions based upon a blood draw or analysis of the defendant's blood."  He cited as supporting authority *Missouri v. McNeely* (2013) 569 U.S. ___ [133 S.Ct. 1552] (*McNeely*), inter alia.  The trial court denied the motion.

b.  *Standard of review.*

"'In reviewing a suppression ruling, "we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, [but] we exercise our independent judgment in determining the legality of a search on the facts so found."' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 979.)  "On appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)

c.  *Analysis.*

"A defendant may move … to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure on … the … grounds … [¶] … [t]he search or seizure without a warrant was unreasonable." (§ 1538.5, subd. (a)(1)(A).)  "We review issues relating to the suppression of evidence derived from police searches and

seizures under federal constitutional standards." (*People v. Rossetti* (2014) 230 Cal.App.4th 1070, 1074 (*Rossetti*), citing *People v. Bradford* (1997) 15 Cal.4th 1229, 1291.)

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.) "'[T]he ultimate touchstone of the Fourth Amendment is "reasonableness."'" [Citation.]" (*Riley v. California* (2014) 573 U.S. ___ [134 S.Ct. 2473, 2482].) "'[W]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, … reasonableness generally requires the obtaining of a judicial warrant.' [Citation.]" (*Ibid.*) "Search warrants are ordinarily required for searches of dwellings, and, *absent an emergency*, no less could be required where intrusions into the human body are concerned." (*Schmerber v. California* (1966) 384 U.S. 757, 770 (*Schmerber*), italics added; see *Winston v. Lee* (1985) 470 U.S. 753, 759 [a subcutaneous intrusion "implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime"].)

In 2011, *Schmerber* was controlling authority. (Accord, *Rossetti*, *supra*, 230 Cal.App.4th at pp. 1074-1075; *People v. Youn* (2014) 229 Cal.App.4th 571, 576 (*Youn*); see *People v. Jones* (2014) 231 Cal.App.4th 1257, 1265 [binding judicial precedent in California pre-*McNeely* consistently interpreted *Schmerber* to permit warrantless blood draws performed in a medically approved manner].) In that case, the defendant was involved in an automobile accident. (*Schmerber*, *supra*, 384 U.S. at p. 758.) At the scene of the accident, he "smelled [of] liquor" and had "'bloodshot, watery'" eyes. (*Id.* at pp. 768-769.) The defendant was taken to a hospital, where—at the direction of a police officer—a physician obtained a blood sample. (*Id.* at p. 758.) The defendant did not consent to the blood draw. (*Id.* at p. 759.) Testing revealed a percent by weight of

alcohol indicative of intoxication.  The toxicology report was later admitted into evidence at trial.  (*Ibid.*)  The defendant was convicted of alcohol DUI.  (*Id.* at p. 758.)

One of the primary issues before the United States Supreme Court in *Schmerber* was "whether the chemical analysis [of the defendant's blood] should have been excluded as the product of an unconstitutional search and seizure."  (*Schmerber*, *supra*, 384 U.S. at pp. 766-767.)  Although it confirmed compulsory blood tests "plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of th[e Fourth] Amendment" (*id.* at p. 767) and a warrant is "ordinarily required" to allow "'a neutral and detached magistrate'" to draw "the inferences to support the search" (*id.* at p. 770), the high court concluded defendant's Fourth Amendment right "to be free of unreasonable searches and seizures" was not infringed (*Schmerber*, *supra*, at p. 772).  It reasoned:

> "The officer in the present case … might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' [citation].  We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system.  Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant.  Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to [the defendant]'s arrest.

> "Similarly, we are satisfied that the test chosen to measure [the defendant]'s blood-alcohol level was a reasonable one.  Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol.  [Citation.]  Such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain….

> "Finally, the record shows that the test was performed in a reasonable manner.  [The defendant]'s blood was taken by a physician in a

32.

hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse." (*Schmerber*, *supra*, 384 U.S. at pp. 770-772, fns. omitted.)

Post-*Schmerber* and pre-*McNeely*, a period spanning nearly 50 years, "'California cases uniformly interpreted *Schmerber* to mean that no exigency beyond the natural evanescence of intoxicants in the bloodstream, present in every DUI case, was needed to establish an exception to the warrant requirement.' [Citation.]" (*Youn*, *supra*, 229 Cal.App.4th at p. 577; see *People v. Ritchie* (1982) 130 Cal.App.3d 455, 457-459 [applying *Schmerber* to drug DUI case].) In 2013, however, the United States Supreme Court in *McNeely* repudiated this interpretation of *Schmerber*:

"[T]he warrant requirement is subject to exceptions. 'One well-recognized exception' … 'applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.' [Citation.] A variety of circumstances may give rise to an exigency sufficient to justify a warrantless search …. [W]e have also recognized that in some circumstances law enforcement officers may conduct a search without a warrant to prevent the imminent destruction of evidence….

"To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of circumstances. [Citations.] We apply this 'finely tuned approach' to Fourth Amendment reasonableness in this context because the police action at issue lacks 'the traditional justification that … a warrant … provides.' [Citation.] Absent that established justification, 'the fact-specific nature of the reasonableness inquiry,' [citation], demands that we evaluate each case of alleged exigency based 'on its own facts and circumstances.' [Citation.] [¶] … [¶]

"It is true that as a result of the human body's natural metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated…. This fact was essential to our holding in *Schmerber*, as we recognized that, under the circumstances, further delay in order to secure a

33.

warrant after the time spent investigating the scene of the accident and transporting the injured suspect to the hospital to receive treatment would have threatened the destruction of evidence.  [Citation.]

"But it does not follow that we should depart from careful case-by-case assessment of exigency and adopt [a] categorical rule ….  In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so….  We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test.  That, however, is a reason to decide each case on its facts, as we did in *Schmerber*, not to accept the 'considerable overgeneralization' that a *per se* rule would reflect.  [Citation.]  [¶] … [¶]

"In short, while the natural dissipation of alcohol in the blood may support a finding of exigency in a specified case, as it did in *Schmerber*, it does not do so categorically.  Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances.  [¶] … [¶]  We hold that in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant."  (*McNeely*, *supra*, 569 U.S. at pp. ___-___, ___, ___ [133 S.Ct. at pp. 1558-1561, 1563, 1568], citations & fn. omitted.)

Notwithstanding *McNeely* and the general rule the United States Supreme Court's new interpretation of the federal Constitution must be given retroactive application to pending cases (*Rossetti*, *supra*, 230 Cal.App.4th at p. 1076), in the instant case, we "need not resolve the question [of] whether the warrantless blood test was reasonable under the[] circumstances [per *McNeely*], because even if it were not, the results of the test would not be excluded from evidence" (*Youn*, *supra*, 229 Cal.App.4th at p. 578).

The Fourth Amendment "'contains no provision expressly precluding the use of evidence obtained in violation of its commands'" (*Herring v. United States* (2009) 555 U.S. 135, 139), but the United States Supreme Court "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial" (*ibid.*). The exclusionary rule "is a 'prudential' doctrine, [citation], created … to 'compel respect

34.

for the constitutional guaranty.' [Citations.]" (*Davis v. United States* (2011) 564 U.S. ___, ___ [131 S.Ct. 2419, 2426] (*Davis*).) "Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search. [Citations.] The rule's sole purpose … is to deter future Fourth Amendment violations. [Citations.]" (*Ibid.*) In other words, the exclusionary rule is limited "to situations in which [deterrence] is 'thought most efficaciously served.' [Citation.] Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly … unwarranted.' [Citation.]" (*Id.* at pp. ___-___ [131 S.Ct. at pp. 2426-2427].)

"[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." (*Davis*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2427].) "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. [Citation.]" (*Ibid.*) "But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, [citation], or when their conduct involves only simple, 'isolated' negligence, [citation], the '"deterrence rationale loses much of its force,"' and exclusion cannot 'pay its way.' [Citation.]" (*Id.* at pp. ___-___ [131 S.Ct. at pp. 2427-2428].) In particular, "when binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities. An officer who conducts a search in reliance on binding appellate precedent does no more than '"ac[t] as a reasonable officer would and should act"' under the circumstances. [Citation.] The deterrent effect of exclusion in such a case can only be to discourage the officer from '"do[ing] his duty."'" (*Id.* at p. ___ [131 S.Ct. at p. 2429].) Hence, "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Id.* at pp. ___-___ [131 S.Ct. at pp. 2423-2424].)

Here, the record shows defendant, after having run over two pedestrians with his truck, informed a hospital nurse he "was withdrawing from methamphetamine." Paglia, who was present, overheard this remark. In "objectively reasonable reliance" (*Davis*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2423]) on *Schmerber*, then still authoritative, Paglia could "reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence'" (*Schmerber*, *supra*, 384 U.S. at p. 770), i.e., the natural evanescence of methamphetamine in the bloodstream. His request for a blood draw to secure evidence of defendant's drug intoxication fell "within the parameters of the 'good faith' exception to the exclusionary rule." (*Rossetti*, *supra*, 230 Cal.App.4th at p. 1076.) Therefore, denial of the motion to suppress was proper.[14]

**V.    The trial court did not abuse its discretion when it admitted into evidence Fidler's opinion regarding defendant's state of intoxication.**[*]

    a. *Background.*

On direct examination, Fidler—a 17-year law enforcement veteran at the time of trial—testified about his education and experience. While he was in the police academy and "mini academy," he was instructed on alcohol and drug DUI investigations. After graduating, Fidler received approximately 100 hours of formalized training on alcohol and drug DUI investigations and "partnered up with three different field training officers," all of whom were skilled alcohol and drug DUI investigators. As a patrolman, he frequently contacted and arrested "people who were either intoxicated by alcohol or drugs." During his career, Fidler participated as either "the initial officer[,] the

---

**14**    The same conclusion was reached by the First Appellate District (*People v. Jones*, *supra*, 231 Cal.App.4th 1257 [alcohol DUI]; *Rossetti*, *supra*, 230 Cal.App.4th 1070 [alcohol DUI]), Second Appellate District (*Youn*, *supra*, 229 Cal.App.4th 571 [drug DUI]), and Fourth Appellate District (*People v. Harris* (2015) 234 Cal.App.4th 671 [drug DUI]).

[*]    See footnote, *ante*, page 1.

investigating officer or assisting officer in well over [1,000] investigations where someone was determined … or was believed to be under the influence of alcohol or a drug." He was also a "POST-certified standardized field sobriety instructor." Fidler was familiar with methamphetamine and its symptoms, having encountered "more than [1,000]" users "over the years."

Fidler related he spoke to defendant at the scene of the accident on April 26, 2011. Defendant "appeared nervous and jittery," "had an accelerated, mumbled speech," and "show[ed] signs of bruxism," i.e., "consistent" "clench[ing]," "twitch[ing]," and/or "thrust[ing of] the[] jaw …." In addition, defendant admitted he was "coming down off of speed."

On cross-examination, Fidler testified he (1) had not authored "any studies of the phases of methamphetamine intoxication and burn off"; (2) had not been trained "to recognize a person being under the influence of methamphetamine, either during the period of time where he is … enjoying his intoxication … or whether it's burning off"; and (3) did not specifically know the "differences of symptomatology … between the burn-off phase and the absorption phase." He was not a drug recognition expert and would defer to such an expert on these issues.

On redirect examination, the following colloquy transpired:

"[PROSECUTOR:] … [Defendant] told you that he was coming down [off] o[f] speed. [¶] Based on what you saw, did you believe him?

"[DEFENSE COUNSEL]: I'm going to object. Lack of foundation, Your Honor. The witness … just testif[ied] he can't recognize the distinction.

"THE COURT: Overruled. [¶] You can answer. [¶] … [¶]

"[FIDLER]: When you take into consideration all the things [defendant] was displaying, the fact that he told me that he was using methamphetamine or speed; the fact that he was showing an accelerated speech or mumbled speech; the fact that he … appeared nervous and jittery,

those things, in themselves, allow me to form the opinion that, yes, he was impaired by methamphetamine."

b. *Standard of review.*

"Admission of lay opinion testimony is within the discretion of the trial court and will not be disturbed 'unless a clear abuse of discretion appears.' [Citations.]" (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127; accord, *People v. Leon* (2015) 61 Cal.4th 569, 600.) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004; see *People v. Kipp* (1998) 18 Cal.4th 349, 371 ["A court abuses its discretion when its ruling 'falls outside the bounds of reason.'"].)

c. *Analysis.*

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] … [r]ationally based on the perception of the witness …." (Evid. Code, § 800, subd. (a); accord, *People v. McAlpin* (1991) 53 Cal.3d 1289, 1306 (*McAlpin*).) "By contrast, when a lay witness offers an opinion that goes beyond the facts [he or she] personally observed, it is … inadmissible." (*McAlpin*, *supra*, at p. 1308.)

"[T]he question of whether a person was intoxicated is not necessarily a matter of expert testimony, as any layman can give his opinion based upon his own observation." (*People v. Ravey* (1954) 122 Cal.App.2d 699, 703; see *McAlpin*, *supra*, 53 Cal.3d at p. 1308 [lay opinion on intoxication admissible whether intoxication is induced by alcohol or drugs]; *People v. Williams* (1988) 44 Cal.3d 883, 915 ["The manifestation of drug intoxication and withdrawal are no less subtle than those of alcohol intoxication, and, unfortunately may be sufficiently common today that lay persons are capable of

recognizing them."].)  For instance, "[l]ay witnesses have been permitted to give an opinion of another's state of intoxication when based on the witness's personal observations of such commonly recognizable signs as an odor of alcohol, slurring of speech, unsteadiness, and the like." (*People v. Williams* (1992) 3 Cal.App.4th 1326, 1332; cf. *People v. Navarette* (2003) 30 Cal.4th 458, 493-494 [in capital murder prosecution, trial court properly disallowed lay witnesses' testimonies regarding the defendant "look[ing] like he was under the influence of cocaine during the day preceding the murders" because neither witness had ever previously observed someone in a cocaine-intoxicated state].)  Police officers in the capacity of nonexpert witnesses are allowed to opine that a defendant is intoxicated or sober so long as this opinion is based on their firsthand scrutiny of the defendant's appearance and demeanor.  (See, e.g., *People v. Spencer* (1963) 60 Cal.2d 64, 88; *People v. Ruiz* (1968) 265 Cal.App.2d 766, 773; *People v. Ravey*, *supra*, 122 Cal.App.2d at pp. 702-703.)

We conclude the trial court did not abuse its discretion when it allowed Fidler to respond to the prosecutor's question, which essentially asked him to give an opinion on whether defendant had taken methamphetamine "[b]ased on what [he] saw."  As a percipient witness, Fidler had observed defendant acting nervous and jittery, muttering hastily, and clenching his jaw.  Having developed a functional awareness of the symptoms of methamphetamine ingestion via his frequent encounters with users over the course of his career, Fidler permissibly opined defendant was intoxicated.

**VI.     The trial court did not abuse its discretion when it admitted into evidence defendant's DUI convictions from 1987, 1988, and 2002.**[*]

a.  *Background.*

Defendant was previously convicted of DUI seven times:  twice in 1987, thrice in 1988, once in 2002, and once in 2009.  The prosecutor sought to admit into evidence all

---

[*]     See footnote, *ante*, page 1.

39.

seven prior convictions to prove implied malice. Defense counsel objected to the admissibility of the five convictions in the late 1980's and the conviction in 2002 on the grounds they were irrelevant, remote, cumulative, and voluminous, pertained to alcohol DUI and not methamphetamine DUI, and "paint[ed defendant] as a very bad person …."

In a May 10, 2013, motion hearing, the trial court ruled:

> "[I]n lieu of telling the jury there w[ere] two [DUI convictions] in '87 and three in '88, [the prosecutor] can get into the fact that [defendant] was convicted of a DUI in '87 and convicted of DUI in '88. Not that there were five, but that he suffered a DUI in each year…. [¶] Regarding 2002 and 2009, those are both in as is. [¶] So the jury will essentially hear that [defendant] suffered DUI convictions in '87, '88, '02 and '09."

The court found no meaningful distinction between alcohol DUI and drug DUI, given "that inability to drive with the caution characteristic of a sober person under the same or similar circumstances relates to both" and acknowledged the relevance of defendant's prior DUI convictions to prove murder under a theory of implied malice. It also determined the 1987 and 1988 convictions were "not remote," noting defendant's criminal record showed (1) "an entry, every single year [between 1989 and 1998], of some sort of violation or new law offense"; (2) four years of imprisonment between 1998 and 2002; (3) "an entry … for one sort of offense o[r] arrest or conviction or violation of parole" in 2002, 2003, 2005, and 2006; (4) 32 months of imprisonment between 2006 and 2009; (5) a DUI in 2009; and (6) "an entry in 2010."[15]

At trial, the jury received a limiting instruction[16] and the parties offered several stipulations. (See *ante*, at pp. 6-8.)

---

[15]    Defendant concedes this is an accurate representation of his criminal record.

[16]    Defendant challenges the trial court's limiting instruction as "not limiting [the prior DUI convictions] to proper considerations, misdirecting the jurors, and causing confusion of the issues." We decline to address this argument because it is not listed under a separate heading or subheading as required by California Rules of Court, rule 8.204(a)(1)(B). (Cf. *People v. Roscoe* (2008) 169 Cal.App.4th 829, 840.)

b.  *Standard of review.*

Rulings made under Evidence Code sections 352 and 1101 are reviewed for an abuse of discretion.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1328; *People v. Mungia* (2008) 44 Cal.4th 1101, 1130; see *ante*, at p. 38.)

c.  *Analysis.*

"Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition …."  (*People v. Kipp*, *supra*, 18 Cal.4th at p. 369, citing Evid. Code, § 1101.)  "However, the evidence may be admitted when it is relevant to prove another issue in the case such as opportunity, intent, knowledge, identity, or absence of mistake." (*People v. Malone* (1988) 47 Cal.3d 1, 17, citing Evid. Code, § 1101, subd. (b).)

Even if other-crimes evidence is relevant on one of the grounds enumerated in Evidence Code section 1101, subdivision (b), it "must not contravene other policies limiting admission, such as Evidence Code section 352."  (*People v. Malone*, *supra*, 47 Cal.3d at p. 18.)  Thus, "the trial court [also] must consider whether the probative value of the [other-crimes] evidence 'is "substantially outweighed by the probability that its admission [would] … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." [Citation.]' [Citation.]" (*People v. Foster*, *supra*, 50 Cal.4th at p. 1328.)  "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)  "'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the

jury will use it for an illegitimate purpose.' [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

In the instant case, defendant's DUI convictions in 1987, 1988, and 2002 were probative on the knowledge element of implied malice. (See, e.g., *People v. Garcia* (1995) 41 Cal.App.4th 1832, 1849, disapproved on other grounds in *People v. Sanchez* (2001) 24 Cal.4th 983, 991, fn. 3; *People v. Brogna* (1988) 202 Cal.App.3d 700, 707; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 532.) Although defendant continues to campaign for disparate treatment of alcohol DUI and drug DUI, we refuse to acquiesce. Whether induced by alcohol or drugs, a DUI "is unlawful … *because* it is dangerous …." (*People v. McCarnes*, *supra*, at p. 532.) Defendant would have us "ignore that basic proposition …." (*Ibid.*)

Moreover, admission of defendant's DUI convictions in 1987, 1988, and 2002 did not create a substantial danger of undue prejudice under Evidence Code section 352. The brief presentation of these uncharged offenses via stipulation was neither extensive, time consuming, nor uniquely inflammatory. In reality, the facts underlying the charged offenses of second degree murder and gross vehicular manslaughter while intoxicated— i.e., mowing down two pedestrians—were more likely to have aroused the passions of the jurors against him. As for cumulativeness, the trial court mitigated this concern by reducing the number of uncharged crimes to be identified from seven to four. A limiting instruction warning jurors not to consider the prior DUI convictions "as evidence of [defendant's] bad character" was also issued. (See *People v. Frazier* (2001) 89 Cal.App.4th 30, 42; *People v. Garcia*, *supra*, 41 Cal.App.4th at p. 1850 [risk of jury punishing a defendant for an uncharged crime counterbalanced by appropriate instruction]; see also *People v. Holt* (1997) 15 Cal.4th 619, 662 ["Jurors are presumed to understand and follow the court's instructions."].) Lastly, while two of the prior DUI convictions occurred more than two decades before the April 26, 2011, accident, respectively, their remoteness was somewhat minimized by defendant's incarceration for

approximately seven of those years.  (See *People v. Walker* (2006) 139 Cal.App.4th 782, 807.)  In addition, remoteness "is but one factor in [an Evidence Code section 352] assessment."  (*Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 133.)

Absent evidence the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1004), we leave this evidentiary ruling intact.

## VII. Admission of defendant's mug shot profile did not constitute prejudicial error.[*]

a.  *Background.*

The prosecutor sought to introduce defendant's April 26, 2011, mug shot profile.[17] Defense counsel objected on the grounds defendant "look[ed] like a hardened criminal …."  After looking at the photograph and disagreeing with defense counsel's description, the trial court admitted the mug shot profile.

Defendant's mug shot profile displayed other information, including the "[c]harges"— i.e., second degree murder, drug DUI resulting in bodily injury, parole violation—and "[b]ooking," "LAR," "CII," and "FBI" numbers.

b.  *Standard of review.*

An appellate court reviews a trial court's rulings regarding relevancy for abuse of discretion.  (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*); see *ante*, at p. 41.)

c.  *Analysis.*

"Only relevant evidence is admissible at trial."  (*Merriman*, *supra*, 60 Cal.4th at p. 74, citing Evid. Code, § 350.)  "Under Evidence Code section 210, relevant evidence is

---

[*]     See footnote, *ante*, page 1.

[17]     The prosecutor had also sought to introduce defendant's booking photograph taken in connection with his drug DUI case in 2009, but withdrew after defense counsel maintained he would not dispute defendant's conviction in that case.

evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'" (*Merriman*, *supra*, at p. 74.)

Defendant contends the mug shot profile "had no tendency to prove any material fact in dispute." We are inclined to agree. Defendant's "identification … as the perpetrator of the crime[s] charged" (*People v. Cook* (1967) 252 Cal.App.2d 25, 29) was not at issue. Furthermore, the mug shot profile conveyed "hearsay declarations of material fact which were inadmissible in themselves" (*id.* at p. 30), a point the Attorney General concedes.

By constitutional mandate, "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of … the improper admission or rejection of evidence, … unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; accord, Evid. Code, § 354, subd. (a).) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson*, *supra*, 46 Cal.2d at p. 836; accord, *People v. Callahan* (1999) 74 Cal.App.4th 356, 363.)

Substantial evidence established defendant appreciated the risk of driving while under the influence of methamphetamine and disregarded that risk when he elected to drive in an impaired condition on April 26, 2011. Defendant's mug shot profile added little to what the jury already knew—that he had prior arrests, convictions, and sentences. Its admission, though erroneous, did not result in a miscarriage of justice. Even had the court excluded this document, it is not reasonably probable defendant would have received a more favorable verdict.

**VIII.  One sentencing error must be corrected.**[*]

At sentencing, the trial court pronounced the following terms:  30 years to life, plus five years for a prior serious felony conviction and four years for four prior prison terms, on count one; 30 years to life, plus five years for a prior serious felony conviction and four years for four prior prison terms, on count two, to be served consecutively; 30 years to life, plus five years for a prior serious felony conviction and four years for four prior prison terms, on count three, stayed pursuant to section 654; 30 years to life, plus five years for a prior serious felony conviction and four years for four prior prison terms, on count four, stayed pursuant to section 654; and 180 days in jail on count five, to be served concurrently.

On appeal, defendant raises various sentencing errors, one of which must be corrected.

　　a.  *The abstract of judgment must be amended to reflect the sentence pronounced by the trial court.*

An abstract of judgment is "a contemporaneous, statutorily sanctioned, officially prepared clerical record of the conviction and sentence."  (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070, italics omitted.)  "Under [section 1213], 'the certified abstract of the judgment constitutes the commitment.  [Citations.]  It is thus the order sending the defendant to prison and "the process and authority for carrying the judgment and sentence into effect."  [Citations.]'  [Citation.]"  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  However, "[a]n abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize."  (*Ibid.*)  "When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, [an appellate] court has the inherent power to correct such clerical error on appeal,

───────────────

[*]　　See footnote, *ante*, page 1.

45.

whether on [its] own motion or upon application of the parties." (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

Here, both the August 6, 2013, abstract of judgment and the September 11, 2013, amended abstract of judgment mistakenly listed, on page 4, an additional two-year term. This clerical error must be corrected.[18]

    b. *The second alleged prior conviction on count five need not be stricken or dismissed, and, as to count five, the abstract of judgment need not be amended.*

Count five of the indictment alleged defendant drove a vehicle at a time when his driver's license "was suspended or revoked pursuant to Vehicle Code Section 14601.2(a), and did an act forbidden by law or neglected a duty imposed by law, which act or neglect proximately caused bodily injury to another person, in violation of Vehicle Code Section 14601.4(a), a misdemeanor." Also alleged as to count five, were two prior convictions "within the meaning of California Vehicle Code Section 14601.2(d)(2)." The jury returned a verdict of guilty on "Driving with a Revoked or Suspended License and Causing Injury, in violation of Section 14601.4(a) of the Vehicle Code, as charged in the fifth count of the Indictment." In a bifurcated trial, the court found the first alleged prior conviction to be true. That allegation read defendant had, "within five years of the commission" of the offense alleged in count five, "committed a violation of Vehicle Code Section 14601.2 …." The court made "[n]o finding" as to the second alleged prior conviction.

Defendant now argues, as to the second alleged prior conviction, that "the enhancement should be stricken as unsupported." The People assert defendant is

---

**18**    Defendant also contends the four prior prison term enhancements should have attached once to the aggregate sentence. We reject the claim in view of *People v. Garcia* (2008) 167 Cal.App.4th 1550.

"correct[]," the prior conviction allegation should be dismissed, and the abstract of judgment amended to reflect "dismissal of the enhancement."

Neither defendant nor the People allege the sentence imposed on count five was error and it was not.[19] What they both urge is that the second prior offense be "stricken" or "dismissed." Neither explain from where that prior offense should be removed. The sentencing minute order merely states "DEFENDANT TO SERVE 180 DAYS IN CUSTODY AS TO COUNT 5. [¶] COUNT 5 TO BE SERVED CONCURRENT WITH COUNT 1."[20] Contrary to the inference suggested by the People's assertion, "the enhancement" is not listed on the abstract of judgment.[21] There is nothing to "strike," "dismiss," or "amend."

---

[19]   A conviction for violation of Vehicle Code section 14601.4, subdivision (a), which occurs within five years of a prior offense that resulted in a conviction of Vehicle Code section 14601.2 allows for imprisonment in the county jail for not less than 30 days nor more than one year. (Veh. Code, § 14601.2, subd. (d)(2).)

[20]   Defendant's presentence time credits (834 days) exceeded the sentence imposed on count five.

[21]   In fact, neither the conviction nor the sentence on count five is listed on the abstract of judgment. An abstract of judgment is "the order sending the defendant to prison and 'the process and authority for carrying the judgment and sentence into effect.'" (*In re Black* (1967) 66 Cal.2d 881, 890.) Its ultimate purpose is to act as a summary of the trial court's judgment for prison authorities that are responsible for the execution of the defendant's sentence. (*People v. Mitchell*, *supra*, 26 Cal.4th at p. 185; *People v. Hong* (1998) 64 Cal.App.4th 1071, 1076, 1080.) The Judicial Council has statutory authorization to determine the contents of what is to appear in the abstract of judgment, (§ 1213.5; *People v. Hong*, *supra*, at p. 1082) and the form does not have an entry for misdemeanor offenses. Item 11 allows for documentation of "[o]ther orders." The trial court could have listed the information relating to count five there, but since defendant completed his sentence on that count prior to his delivery to state prison, it is not information needed by prison authorities to fulfill their obligation. (See *People v. Hong*, *supra*, at p. 1083.)

**IX. The trial court did not abuse its discretion when it determined certain peace officers' personnel records contained no discoverable material.**[*]

a. *Background.*

On March 13, 2013, defense counsel filed a motion for discovery of the personnel records of Fidler and Officer Christopher Bagby. Specifically, he sought documentation relating to "complaint[s] … by any inmate, fellow officer, or private citizen alleging any use of unnecessary force or violence, acts demonstrating racial or ethnic prejudice, illegal or false arrest, improper tactics, dishonesty, false imprisonment, false police reports, and illegal search and seizure." On April 2, 2013, the trial court found good cause to review Fidler's and Bagby's records with respect to "truthfulness and false reports" only. The court subsequently conducted an in camera hearing, found no discoverable material, and sealed the reporter's transcript.

On appeal, defendant asks us to "review the confidential reporter's transcript and any other associated material before the trial court when it ruled on the [*Pitchess*] motion" and "determine whether the trial court abused its discretion in refusing to disclose the contents of the officer[s'] personnel records pursuant to *Pitchess*." (Italics added.) The Attorney General does not oppose this request.

b. *Standard of review.*

"A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion." (*People v. Hughes* (2002) 27 Cal.4th 287, 330; see *ante*, at p. 38.)

c. *Analysis.*

"'A criminal defendant has a limited right to discovery of a peace officer's personnel records. [Citation.] Peace officer personnel records are confidential and can only be discovered pursuant to Evidence Code sections 1043 and 1045.' [Citation.]" (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 180; see *People v. Mooc* (2001) 26

---

[*] See footnote, *ante*, page 1.

Cal.4th 1216, 1220 (*Mooc*) [California Legislature codified *Pitchess* motions].) "[O]n a showing of good cause, a criminal defendant is entitled to discovery of relevant documents or information in the confidential personnel records of a peace officer accused of misconduct against the defendant." (*People v. Gaines* (2009) 46 Cal.4th 172, 179 (*Gaines*), citing Evid. Code, § 1043, subd. (b).) "Good cause for discovery exists when the defendant shows both '"materiality" to the subject matter of the pending litigation and a "reasonable belief" that the agency has the type of information sought.' [Citation.]" (*Gaines*, *supra*, at p. 179.)

"If the trial court concludes the defendant has … made a showing of good cause, the custodian of records should bring to court all documents 'potentially relevant' to the defendant's motion" (*Mooc*, *supra*, 26 Cal.4th at p. 1226) and "the court must review the requested records in camera to determine what information, if any, should be disclosed" (*Gaines*, *supra*, 46 Cal.4th at p. 179). "Subject to statutory exceptions and limitations … the trial court should then disclose to the defendant 'such information [that] is relevant to the subject matter involved in the pending litigation.'" (*Mooc*, *supra*, at p. 1226, quoting Evid. Code, § 1045, subd. (a).)

Here, the trial court followed proper procedure and created an adequate record of the April 2, 2013, in-camera hearing. (See *Mooc, supra,* 26 Cal.4th at pp. 1228-1229.) We also examined Fidler's and Bagby's confidential personnel files.[22] Based on our review, the trial court did not fail to disclose materials "so clearly pertinent to the issues raised by the *Pitchess* discovery motion that failure to disclose them was an abuse of *Pitchess* discretion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 827.) We thus conclude the court properly exercised its discretion.

---

[22]     We ordered the augmentation of the appellate record to include these materials.

## DISPOSITION

The additional two-year term entered in the August 6, 2013, abstract of judgment and the September 11, 2013, amended abstract of judgment is stricken. The trial court is directed to prepare a corrected abstract of judgment and transmit copies thereof to the appropriate authorities. As so modified, the judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:

_____
KANE, Acting P.J.

_____
PEÑA, J.