Filed 8/11/16  P. v. Rice CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>              v.<br><br>JUSTIN EUGENE RICE,<br><br>        Defendant and Appellant. | F068870<br><br>(Super. Ct. No. MCR036010)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  David D. Minier, Judge.  (Retired Judge of the Madera Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

On the afternoon of August 20, 2009, defendant Justin Eugene Rice crossed over into the oncoming traffic lane in his truck and hit a sedan carrying five women head-on, killing three of them and injuring the other two. Defendant was charged by information with three counts of second degree murder in violation of Penal Code section 187, subdivision (a) (counts 1–3);[1] three counts of gross vehicular manslaughter while intoxicated in violation of section 191.5, subdivision (a) (counts 4–6); one count of driving under the influence of alcohol or drug and causing great bodily injury in violation of Vehicle Code section 23153, former subdivision (a) (count 7); and two counts of resisting an executive officer by the use of force or violence in violation of section 69 (counts 8 & 9). The information further alleged that as to counts 1 through 6, defendant had a prior serious felony conviction (§ 667, subd. (a)(1)); as to count 7, defendant inflicted great bodily injury or death to four victims (Veh. Code, § 23558); and defendant had a prior strike conviction (§ 667, subds. (b)–(i)), served five prior prison terms (§ 667.5, subd. (b)), and committed the offenses while on bail or on his own recognizance (§ 12022.1).

After the close of evidence, defendant moved for acquittal on the three second degree murder counts and the two counts of resisting an executive officer by the use of force or violence for lack of evidence (§ 1118.1). The trial court denied the motion and the jury subsequently found defendant guilty of three counts of involuntary manslaughter (§ 192, subd. (b))[2] (lesser crimes to counts 1–3); three counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)) (counts 4–6); one count of driving under the influence of alcohol or drug and causing great bodily injury (Veh. Code,

---

[1]  All further statutory references are to the Penal Code unless otherwise specified.

[2]  The reference to section 192, subdivision (b) appears to be the result of a scrivener's error, as that subdivision does "not apply to acts committed in the driving of a vehicle." (§ 192, subd. (b).) Subdivision (c) of section 192 applies to vehicular manslaughter.

§ 23153, former subd. (a), (count 7); and two counts of resisting an executive officer (§ 148, subd. (a)) (lesser crimes to counts 8 & 9). The jury also found true the special allegation that defendant inflicted great bodily injury or death to four victims (Veh. Code, § 23558).

Immediately after the verdicts were read, before they were recorded and the jury discharged, defendant's trial counsel informed the court verdicts were not returned on the greater counts. After being sent back to deliberate further, the jury returned convictions on three counts of second degree murder (§ 187, subd. (a)) and acquittals on two counts of resisting an executive officer by the use of force or violence (§ 69). In a subsequent bifurcated proceeding, the court found the enhancement allegations under sections 667, 667.5, and 12022.1 true.

Defendant was sentenced to three consecutive terms of 30 years to life for each of the second degree murder counts (counts 1–3, doubled due to the strike conviction); three 20-year terms for counts 4 through 6 (aggravated terms, stayed pursuant to § 654); a seven-year term for count 7 (stayed pursuant to § 654); and two 365-day terms in jail for counts 8 and 9, with credit for serving those terms. Defendant also received five years for the strike conviction (§ 667, subd. (a)(1)) and one year for one of the five prior prison term enhancements (§ 667.5, subd. (b)). Additionally, pursuant to section 1385, the court imposed but struck four one-year terms for the other prior prison term enhancements (§ 667.5, subd. (b)), and imposed but stayed a two-year term for committing the offenses while out on bail (§ 12022.1). Defendant was sentenced to a total state prison term of 90 years to life, plus a determinate term of six years to be served first.

On appeal, defendant argues the trial court erred in denying his section 1118.1 motion for acquittal on the second degree murder counts and he was convicted on insufficient evidence that he acted with implied malice. Defendant also argues that by bringing the incomplete verdicts to the trial court's attention, the burden of which rests with the prosecution under the law and which resulted in his convictions for second

3.

degree murder, his trial counsel rendered ineffective assistance of counsel. (*People v. Fields* (1996) 13 Cal.4th 289, 311.)

We find substantial evidence supports the second degree murder convictions and we reject defendant's ineffective assistance of counsel claim on direct appeal, finding a remedy is more appropriately sought in a petition for writ of habeas corpus. (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) The judgment is therefore affirmed.

## FACTUAL SUMMARY

Florida Florencia Zurata was on her way to work at Chukchansi Casino at approximately 2:30 in the afternoon on the day of the collision. Accompanying Zurata in her car were four coworkers, Elena Cruz Mendoza, Maria Erika Flores Rodriguez, Estella Frias, and Patricia Prendra Pedraza. Zurata was driving northbound on Highway 41 in Madera County, going the speed limit of 55 miles per hour. At the same time, defendant was headed southbound on Highway 41, bound for Ventura after visiting his grandfather in Oakhurst. At some point prior to his departure, defendant took three hits of methamphetamine (meth) and he had slept only one hour the previous night. No adverse weather or road conditions were present, and there were no mechanical issues affecting defendant's truck. Driving in excess of the speed limit in a full-size, lifted truck, defendant crossed over into the opposing traffic lane and hit Zurata's sedan head-on but slightly off-center. Defendant's truck went over the hood of Zurata's car, with the passenger sides of both vehicles taking the brunt of the impact. Mendoza, Flores, and Frias died on impact or shortly thereafter. Zurata and Pedraza, who was sitting in the backseat behind Zurata, were injured but survived. Although defendant was not wearing a seatbelt and his truck rolled, coming to rest on its cab, he survived and did not sustain any major injuries.

## I. Prosecution Case

### A. Incident Two Hours Prior to Collision

Around noon on the day of the collision, Rodney Pearl and Joseph Otten encountered defendant near Oakhurst. As they were driving on Road 426 approaching Oakhurst, they noticed a "traffic ball up." Pearl, a retired police officer, saw that cars were not moving and were navigating from the right lane into the left lane around something in the road. Eventually, Pearl saw there was debris in the roadway. Pearl parked his truck so as to block the lane while Otten, his passenger, jumped out and moved the debris out of the road. As they departed, Pearl testified he saw a truck backing down toward the stuff they moved out of the roadway, against traffic. Pearl testified it was obvious to him it was the person whose stuff had been in the road. The driver, identified as defendant, glared at them, and Pearl pointed to where the stuff had fallen out and yelled it was back there. Pearl then continued on and turned left onto southbound Highway 41. Traffic was heavy at that time. Pearl subsequently heard an engine gunning and, in his side view mirror, saw the same truck traveling at a very high rate of speed, weaving in and out of traffic and driving in the turn lane and into opposing traffic. The truck pulled directly behind Pearl and the driver honked the horn, waving Pearl over. Pearl turned left and pulled over in a lot on the northbound side of the highway. Defendant followed and drove alongside the passenger side of Pearl's truck.

Defendant was agitated and appeared angry to Pearl. He accused Pearl and Otten of taking some of his stuff. Pearl told him they did not take anything and only moved it off the road. Defendant wanted to look in Pearl's truck but Pearl told him to stay in his truck. Pearl testified he was afraid at that point, and defendant again stated they had put his stuff in their truck. Pearl asked Otten if he had done anything with the stuff, and Otten explained something had fallen out when he opened the passenger door and he threw it back in the truck. Defendant asked if Pearl was sure and Pearl told him to go back and get his stuff. Defendant stood there for a minute and glared, scaring Pearl. He

then backed up his truck and headed back toward his stuff. Pearl testified that he was taken aback by defendant's aggressiveness and he said to Otten, in reference to defendant's driving, "'That guy is going to kill somebody.'"

### B. Witnesses to Collision

#### 1. Southbound Driver

Several hours later, Ingrid Olivas was following behind defendant's truck on a road connecting to Highway 41. Olivas and defendant traveled on that road for approximately 10 minutes, during which time Olivas observed defendant's truck veer a little bit, catching her attention. She thought the driver might possibly be on the phone or changing the radio station. They both turned south on Highway 41, with Olivas remaining behind defendant's truck. Olivas saw defendant's truck slowly veer left toward oncoming traffic and then slowly move back over into the southbound lane, as, she testified, when a driver starts to fall asleep or is drunk. Olivas stated defendant veered in total three or four times before the fatal collision, and she flashed her headlights at him several times to wake him or get his attention. After he veered a few times, she backed off to keep some distance from the truck. She then called 911 after seeing his truck sideswipe a guardrail and bounce back into the lane. She did not observe any brake lights and, after the truck hit the guardrail, it continued on as if nothing had occurred. The truck veered two more times after hitting the guardrail. Approximately one or two miles from the point he struck the guardrail, defendant slowly veered into the other traffic lane and almost hit a northbound vehicle that swerved out of his way. He then hit the next northbound vehicle and his truck flipped over.

Olivas testified that from what she could see, there was no southbound traffic other than defendant's truck and her vehicle, and she thought defendant was driving a little fast. On cross-examination, she testified defendant was not passing cars.

6.

## 2. Northbound Drivers

As defendant was driving southbound on Highway 41, a group of three cars was traveling northbound. Thomas Blackmore, who was driving his mother to the casino in her car, was in the lead and obeying the 55 mile per hour speed limit. Florida Zurata was following directly behind him and Ramona Rodriguez was following directly behind her. Blackmore, who had the "front row seat" according to the investigating officer, observed a black Chevy truck cross over into the northbound lane from toward the end of a pack of five to seven southbound vehicles, in an attempt to pass the southbound vehicles. The truck was traveling at a high rate of speed and accelerating. Blackmore realized defendant was running out of time to complete his pass and then realized he was not going to make it. Blackmore moved over to the right so he was straddling the "fog line." However, defendant also kept moving to his right, as if he was "fixated" on Blackmore. Blackmore testified he had "two to three seconds to decide [his] fate at this point" and he waited until the last second before jerking his steering wheel to the right, braking hard, and coming to a stop off the roadway. Defendant passed Blackmore so closely that he could have reached out his window and hit the mirror on defendant's truck. Blackmore and his mother heard and felt an explosion, and Blackmore looked in his mirror and saw Zurata's car sitting sideways in the road with a damaged front end.

Florida Zurata testified she was driving along observing oncoming traffic when she saw another vehicle get into her lane. She grabbed the wheel and applied the brakes. Within seconds, the other vehicle hit her car. She testified she "did not see that he was passing other cars." She just saw he crossed over from his lane into her lane and then impact occurred.

Ramona Rodriguez was driving northbound behind Zurata in her van. It was a job-related drive she made twice a day for more than two years. There was one other vehicle in front of Zurata. She noticed cars in front of her swerving to the right and approximately three or four southbound cars swerving to their right to avoid something,

7.

and she assumed there was something in the road. As she started down a slight hill or decline in the road, she saw the top of defendant's truck coming toward her in her lane, in excess of the speed limit. As she got closer, she saw the first vehicle in her lane, driven by Blackmore, swerve out of the way to the right and she said, "'You know what, he's not going to make it. He's not going to make it.'" Rodriguez slowed and came to a stop as defendant's truck hit Zurata's car, flipped approximately three or four times, and came to rest on its roof in front of her. She saw defendant crawl out of his truck. Rodriguez got out of her car and asked defendant if he was okay, if anyone else was in the truck, and if he had been wearing a seatbelt. He responded he was okay and no one else was in the truck, and he stated he had not been wearing a seatbelt. Rodriguez told him to go and check on the people in the other car. He asked, "'What car?'" and she told him he hit a car. He responded, "'Oh my God.'" Rodriguez described him as being "a little … not there—not quite himself," and testified, "[A]fter rolling around in your truck for two or three times flipping, I imagine you're like a little lost where you are." Defendant then sat down on the curb.

### C.     Emergency and Law Enforcement Personnel

Danielle Philipson, a former firefighter emergency medical technician, was driving her motorcycle northbound on Highway 41 when she encountered the accident scene. People were just starting to get out of their cars and she pulled over to help because of her professional training. Philipson saw defendant crawling out of his truck and she approached him. She observed he was calm but a little dazed and his gait was meandering rather than purposeful. Defendant asked her about the people in the other car, although he did not seem "excessively concerned." He told her "he had heard a loud bang and that was it," and she found "the content was just way too relaxed." She also observed that defendant's speech was "very slow, kind of lethargic" and he was "not very good at making eye contact." Defendant told Philipson he had not been wearing a seatbelt. He said his head hurt and she saw a scrape on his shoulder. She testified that

8.

defendant's pulse was "very, very slow considering what had just happened," and his pupils were fixed and not very reactive to the sunlight. When the ambulance arrived, she walked him over to it.

Lance Hoffrage, a paramedic and field supervisor, was doing a ride-along evaluation of one of the paramedics assigned to the ambulance assisting defendant. Hoffrage testified defendant was alert, oriented, and able to obey commands and follow questions, but was anxious and distracted. He was able to answer specific questions, but would then lose focus. Hoffrage also testified defendant was concerned about his personal belongings in the road, but did not inquire if others were hurt. Hoffrage noted defendant's pupils were not reactive to light and, during the transport, he was paranoid and would lose track of his surroundings. In terms of external physical injuries from the crash, defendant sustained a very minor injury to his elbow or upper arm, and an abrasion to his head. On cross-examination, Hoffrage testified he recalled defendant's respiration rate, pulse, blood pressure, and temperature were within normal limits, and his pupils were normal in size although not reactive to light. Defendant did not have any signs of a serious concussion requiring immediate treatment, but he was transported to the hospital for further evaluation.

California Highway Patrol (CHP) Officer Grotto was the investigating officer. At the scene of the collision, defendant told Grotto he had been driving 45 miles per hour in his traffic lane and had not been passing cars. Grotto described defendant at the scene as "very calm, very lethargic, very slow in his reactions," his speech was slightly slurred, and his pupils were constricted. Based on his observations, Grotto suspected drugs were involved, but defendant initially denied using any drugs. Defendant subsequently stated he used medically prescribed marijuana often.

Officer Grotto interviewed Florida Zurata at the hospital and she stated she saw a truck going southbound in the northbound lane, passing cars.

9.

Officers Miller and McKown were directed to go to the hospital and detain defendant there until the investigating officer could show up. Miller arrived first and he observed defendant interacting with a nurse. Defendant was rushed and hurried with the nurse, and his speech pattern was rapid. Miller told defendant several times he had to remain at the hospital until the investigating officer arrived. Defendant ignored him, acting as if he was not there. After the nurse walked away, defendant moved toward the door and Miller stood in his way. Defendant tried to walk around Miller, and he stopped and glared when Miller blocked his path. Defendant appeared angry.

Officer McKown arrived at that point and they had defendant sit in a chair. Miller testified defendant was agitated and Miller engaged him in small talk to deescalate the situation. Defendant responded to some questions and then stated he "was Michael the Archangel." Defendant said he "was on a mission from God and he was in a parallel universe," where "everyone is the opposite of who they are here." Regarding the crash, defendant stated he "was shot out of the sky." Miller testified that defendant would go in and out of reality, expressing his desire to leave and commenting on McKown's uniform, then talking about being Michael the Archangel. McKown testified that defendant said bizarre things and rambled on, talking about angels and his children wanting to kill him. McKown described defendant as "disassociated like he was not speaking at any one in particular," and Miller observed he lacked focus.

After Miller moved away to take a phone call, he heard raised voices and McKown telling defendant to sit down. Miller saw defendant heading toward an exit with McKown positioned between defendant and the exit, facing defendant and backpedaling as defendant moved toward the exit. Miller testified he saw defendant cock his left arm back as if he was going to punch McKown.

McKown testified that after defendant "sprung out of the chair," he told defendant to sit down and grabbed defendant's upper arms to stop him. Defendant jerked his left arm way. Miller ran over and after a struggle, defendant yelled, "'Okay. Okay. I quit,'"

10.

and he was handcuffed. McKown testified that defendant's demeanor went back and forth between calm and agitated, and McKown described him as "disoriented, a little incoherent."

After being transported to the CHP office in Madera, defendant told Officer Grotto he had used meth four days prior, but then said he took "three hits" the day before. He also told Grotto he was the archangel.

Officer Van Ornam, a certified Drug Recognition Evaluator (DRE) and an investigator with the Multi-Agency Investigative Taskforce (MAIT) with the Madera Police Department, evaluated defendant at the CHP office. Defendant stated he had slept one hour the previous night. Van Ornam observed defendant's speech was slow, halting, and rambling; and he was lethargic and drowsy, his face was red and flushed, and his eyes were red and watery.

Van Ornam conducted field sobriety tests on defendant. On the Rhomberg balance test, defendant had a one-inch, 360-degree sway, he estimated 30 seconds had passed at 40 seconds, he failed to keep his head tilted back, and he had eyelid tremors. Van Ornam testified those results were notable to him because they indicated abnormal balance, inability to keep time, and memory recall issues; and eyelid tremors "specifically relate[d] to the use of stimulants." On the walk-and-turn test, defendant was unable to maintain his balance and he did not correctly follow the instructions; and on the one-leg stand, he had poor balance, did not correctly follow the instructions, and had poor memory recall. Defendant's performance on the one-leg stand test was such a departure from the instructions that Van Ornam discontinued the test and reinstructed defendant. Defendant also displayed poor balance the second time. Finally, Van Ornam had defendant perform the finger-to-nose test, and defendant had trouble with depth perception and memory recall. Van Ornam then took defendant's pulse and blood pressure, which were normal, and his temperature, which was slightly below average; and he tested defendant's eyes in three levels of light. In each instance, defendant's pupils

11.

were smaller than average and they had a slow reaction to the light, the latter consistent with being under the influence of meth, Van Ornam testified.

During questioning, defendant told Van Ornam he first began using meth at age 16, and had used other drugs. He stated he last used meth four days prior and marijuana the night before. Throughout the evaluation, defendant said he had the ability to transform himself into different animals and colors, which Van Ornam testified spoke to impairment. Based on the totality of all the circumstances, including the circumstances of the collision, various test results, defendant's interview, defendant's conduct at the hospital toward Officers Miller and McKown, and defendant's bizarre statements regarding archangels and transforming into animals, Van Ornam concluded he was under the influence of a stimulant and marijuana, and was unable to safely operate a motor vehicle. The subsequent toxicology results showed defendant had meth, a stimulant, in his system; however, the level of marijuana, while present, was below the cutoff and, therefore, not considered a "positive" result. When asked about those results, Van Ornam testified they confirmed his opinion as to the stimulant, but not as to the marijuana.

Although Van Ornam did not question defendant in greater detail about his meth use, Van Ornam found it significant that defendant, who was then 32 years old, first used meth at age 16 and had tried other drugs, and that he had used meth extensively enough to state his preference was to smoke it or snort it. Van Ornam also testified that elevated pulse, elevated blood pressure, and dilated eyes are considered peripheral effects, and chronic, longtime users of meth can build up a tolerance to those effects.

### D. Toxicology Expert

State Department of Justice Criminalist Nadina Giorgi testified for the prosecution as an expert in blood analysis and the effects of meth on driving. Defendant's blood was drawn for testing approximately five hours after the collision, and his test results showed a concentration of 120 nanograms of meth per millimeter and 25 nanograms of

12.

amphetamine per millimeter.[3] Giorgi testified that meth can be prescribed for some medical conditions, but the typical therapeutic level is between 10 and 50 nanograms per millimeter.

Regarding defendant's constricted pupils and normal vital signs, Giorgi explained that meth is a central nervous system stimulant and, typically, it causes dilated pupils that react to light, although the reaction can be slower. Opiates, in contrast, typically cause constricted pupils. Defendant's pupils were determined to be constricted, and Giorgi explained that is not inconsistent with meth use. Pupil constriction has been seen in people who have used a lot of meth, either long-term or in recent quantity, and although the exact reason remains unknown, theories include worn out eye muscles from repeated use or an effect from the neurotransmitters affected by meth.[4] As for defendant's normal heart rate, blood pressure, and pulse, she testified normal variation can account for differences and the level of meth in defendant's system, although more than a trace amount, was not tremendously high and was consistent with having used it the night before. As meth begins to exit the system, the person enters the "downside," or withdrawal phase, of meth, during which fatigue, lethargy, sleepiness, paranoia, hallucinations, and delusions may be seen.[5] In this phase, normal vital signs such as blood pressure and pulse rate are not inconsistent with having used meth, and the user's tolerance of the drug may be a factor.

---

[3] Giorgi explained the body converts methamphetamine into amphetamine, a metabolite and, therefore, although amphetamine is itself a drug that can be prescribed or used recreationally, relative levels such as those seen in defendant indicate that he took only meth.

[4] Giorgi testified that use of meth commencing at the age of 16 is consistent with long-term use. She also considered tolerance an issue, given defendant first used meth as a teenager.

[5] As used in this opinion, the terms "downside" and "withdrawal" phase, stage, or syndrome are interchangeable. As explained by the defense's expert, while it is a technical issue, the "withdrawal stage," or downside, comes before active withdrawal and it occurs when the user is "coming down or starting to crash."

Additionally, defendant's agitation and nervousness at the hospital, and his archangel comments, were, combined with everything else, consistent with meth. Also consistent with the downside of meth was defendant's 40-second estimate of 30 seconds in the Rhomberg test, which indicated a slower internal clock. Giorgi testified defendant's one-inch sway was consistent with any number of drugs, including meth, and his eye tremors were also consistent with meth. Defining impairment as "too affected by the drug to safely operate a motor vehicle," Giorgi concluded that based on defendant's toxicology results; his driving pattern; his statements; witnesses' observations of his sluggish demeanor, slurred speech, constricted and slow reacting pupils, paranoia, religious and other delusions, agitation, and fatigue; and his performance on field sobriety tests, he was on the downside of meth and too impaired by the drug to safely drive.

### E.    Accident Investigation and Reconstruction Investigators

Finally, three CHP investigators assigned to MAIT and involved in the investigation and accident reconstruction of the fatal collision testified. The investigation included analysis of data from the Sensing Diagnostic Module (SDM), which repeatedly takes "a snap shot" of information from the vehicle, including throttle position, speed, and braking.[6] Officer Kolter, one of the investigators, testified that in the five seconds leading up to the collision, defendant's speed was increasing and, at the point of impact, he was going between 69 and 73 miles per hour.[7] In those seconds prior to impact, the engine's revolutions per minute (RPM), or engine speed, increased from 2,752 at five seconds prior to impact to 4,992 at the point of impact; and the throttle went from 86 percent at five seconds before impact to 98 percent between seconds four, three, and

---

[6]    Although the term is incorrect, lay persons sometimes refer to the SDM as "the black box."

[7]    Kolter testified that "time zero" is within milliseconds of impact, and eight seconds of pre-collision braking data was recorded while five seconds of pre-collision data was recorded for the other categories. In this opinion, for ease of reference, we consider "time zero" to be impact.

14.

two, dropping to 42 percent at one second prior to the point of impact. The brakes were not used in the eight seconds prior to impact.[8] Analysis of the data led Kolter to conclude defendant was accelerating in the seconds leading up to the collision and then took his foot off the accelerator at the last second, a pattern consistent with accelerating to pass cars.[9] Although investigators could not rule it out as impossible, the data was not consistent with falling asleep at the wheel.

## II. Defense Case

### A. Toxicology Expert

John Fullerton, M.D., testified for the defense as an expert in general medicine and toxicology. Dr. Fullerton opined that the traditional method of testing for meth or amphetamine was through a urine analysis because the level does not vary much from hour to hour. In comparison, meth or amphetamine is metabolized relatively rapidly in the blood and, therefore, more uncertainty surrounds extrapolating the time of ingestion from the toxicology results. In Dr. Fullerton's opinion, defendant could have ingested meth two days before or four days before the accident; it was impossible to know for sure. Defendant's levels of meth and amphetamine were not high, and he was not in a severe, acute phase of intoxication. Dr. Fullerton testified that large pupils are a hallmark of recent meth ingestion and pupil size is "a pretty sensitive marker." Defendant's pupils were on "the small side" and "somewhat reactive after awhile [*sic*]," which indicated no

---

[8]    Kolter testified that because the data showed force was removed from the throttle, or accelerator pedal, at one second prior to impact, it was possible that defendant may have stepped on the brake between one second and time zero, or within milliseconds of impact, but such data was not captured.

[9]    At 98 percent, the throttle was essentially at 100 percent, and "wide open" or "hammered down."

recent, acute ingestion.[10] Defendant's normal pulse, blood pressure, and temperature were also indicators of ingestion that was hours or even days prior to the accident.

Dr. Fullerton also testified that he would expect to see "some concussive level of trauma" in someone who was not wearing a seatbelt and involved in a rollover crash, and coherence, alertness, and the ability to talk and answer questions does not mean there is an absence of concussive trauma. Regarding defendant's reaction to the accident in terms of remorse or other emotions, Dr. Fullerton opined that could be accounted for by the possibility of concussive trauma and the fact that some level of meth was still circulating in defendant's system. Defendant's ability to perform the field sobriety tests could also have been affected by possible concussive trauma.

Dr. Fullerton testified there was probably "an element of substance induced withdrawal" going on and, in his opinion, defendant was in the "withdrawal syndrome" phase and likely fell asleep at the wheel. On cross-examination, Dr. Fullerton testified that flashbacks, or hallucinations, can also occur in the withdrawal phase and that "there may be some level of impairment during that phase," with fatigue, drowsiness, and lethargy all being possible.

### B.  Witness to Incident Two Hours Prior to Collision

The defense also called Otten, who was Pearl's business partner and the passenger in Pearl's truck when they encountered defendant hours before the fatal collision. Otten testified that as they were in the left turn lane at Road 426 and Highway 41, defendant started to make the turn and some stuff fell out of his truck as he took off. Otten hopped out to move the stuff, which was blocking the road. As he did, a map book fell out of the door pocket. He put it back, moved defendant's stuff, and got back in the truck. Pearl passed defendant, who had pulled off the road. Pearl was in the outer left turn lane.

---

**10**  Regarding the research on smaller pupil size and meth ingestion, Dr. Fullerton stated "paradoxical rebound" is seen in other areas of medicine and toxicology, and that phenomenon may have occurred in defendant's situation.

16.

Defendant pulled behind him and then drove into opposing traffic to get around a car waiting to make a U-turn from the inner left turn lane.  Pearl pulled over in the lot and defendant followed.  Defendant thought Otten had taken some of his stuff and put it in Pearl's truck.  Otten testified he offered to have defendant take a look, but Pearl put a stop to that, although Otten could not remember the exact details.

On cross-examination, Otten testified he knew some meth users well.  When under the influence of meth, they acted "[v]ery angry, bode up" as opposed to normal and loving.  Otten described defendant's demeanor as "abnormal" and stated he was "bode up," like those Otten knew when they were under the influence of meth.  Otten also testified defendant was yelling at them and using vulgarities when they were all in the lot together, and when he got out of his truck, he was angry, leaning forward, and "big-eyed" as opposed to having a "normal" look on his face.

## DICUSSION

## I.    Sufficiency of the Evidence Supporting Second Degree Murder Convictions

### A.    Standard of Review

"In considering whether the trial court erred in failing to grant the motion for judgment of acquittal under section 1118.1 … we ask whether 'there is any substantial evidence, including all reasonable inferences to be drawn from the evidence, of the existence of each element of the offense charged.'" (*People v. Watkins* (2012) 55 Cal.4th 999, 1019, fn. omitted.)  On appeal, "we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*Ibid.*)  The relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether … *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055, cert. den. (2016) ___ U.S. ___ [136 S.Ct. 1714].)  We "presume in support of the judgment the existence

17.

of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ….'" (*People v. Nguyen*, *supra*, at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio*, *supra*, at p. 357.)

## B.       Implied Malice

"Murder is the unlawful killing of a human being … with malice aforethought" (§ 187, subd. (a)), and malice may be express or implied (§ 188).  Even if accidental, a fatal traffic collision can support a conviction for second degree murder if there is sufficient evidence the defendant acted with implied malice.  (*People v. Watson* (1981) 30 Cal.3d 290, 300–301; *People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358 (*Jimenez*); *People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1112–1113; *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1090; *People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697 (*Costa*).)  "[M]alice may be implied when [the] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*People v. Watson*, *supra*, at p. 300.)  It "requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)

"Implied malice is determined by examining the defendant's subjective mental state to see if he or she actually appreciated the risk of his actions.  [Citations.]  Malice may be found even if the act results in a death that is accidental.  [Citation.]  It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence." (*Costa*, *supra*, 183 Cal.App.4th at p. 697.)  Although four factors relevant to guiding the determination were recently articulated in *People v. Batchelor*, *supra*, 229 Cal.App.4th at pages 1114–1115, "courts have

18.

recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach" (*Costa*, *supra*, 183 Cal.App.4th at p. 698). Indeed, lack of intoxication or absence of a high speed flight from police "'does not preclude a finding of implied malice'" (*ibid.*), nor does a finding of implied malice require "a 'predicate act'" such as a prior driving under the influence (DUI) conviction, a DUI-related accident, or a judicial or drug rehabilitation-related admonition of the dangers of driving while intoxicated (*People v. Johnigan*, *supra*, 196 Cal.App.4th at pp. 1090–1091).

Defendant contends there is insufficient evidence he was subjectively aware of the risk, and he points to a "paucity of objective evidence that [he] was under the influence of [meth] and not falling asleep while driving." The People counter that defendant's burden on appeal is enormous and there is substantial evidence from which any reasonable trier of fact could find implied malice.

### 1. Driving Under the Influence of Meth

We reject defendant's assertion that there is a paucity of evidence he was driving under the influence. We recently addressed a conviction for second degree murder stemming from a meth-related DUI conviction in *Jimenez*, *supra*, 242 Cal.App.4th at pages 1356–1357. In that case, the defendant was on the downside of meth when he fell asleep while driving, running over and killing a couple. We refused to countenance the proposition that impairment from the downside of meth cannot support a DUI conviction, stating, "Substantial evidence established [the] defendant smoked methamphetamine and subsequently underwent withdrawal, resulting in somnolence that impaired his driving. We cannot overlook the fact [the] defendant endured the effects of methamphetamine withdrawal—namely, sleepiness—*precisely because he had used methamphetamine*." (*Id.* at p. 1357, fn. omitted.) Here, the evidence was substantial that defendant's ability to safety operate a motor vehicle was impaired due to his ingestion of meth. That the evidence showed defendant was on the downside of meth rather than in the phase of

19.

acute intoxication does not undercut the finding of impairment.[11] (*Jimenez, supra*, at p. 1357.)

Defendant gave conflicting statements regarding when he last used meth, but the jury could have reasonably credited his statement he took three hits of meth the night before rather than his statement he last used it four days' prior, given that the toxicology results, the prosecution expert's opinion, the DRE officer's opinion, and various witness statements were consistent with use the prior evening. Furthermore, the meth in defendant's system exceeded a therapeutic level and the prosecution's toxicology expert testified defendant was impaired—that is, unable to safely operate a motor vehicle—due to his methamphetamine ingestion.[12] Multiple witnesses testified regarding defendant's slow, slurred speech, constricted and slow reacting pupils, and vacillation between agitation and calmness. There was also testimony on defendant's paranoia, religious and other delusions, combativeness, waxing and waning of focus, and drifting between reality and a state of delusion. Officer Van Ornam, a certified DRE, concluded defendant was under the influence of a stimulant based on a totality of the circumstances and that his drug-induced impairment was the cause of the collision. The prosecution also adduced evidence explaining that defendant's constricted pupils and normal vital signs were *not* inconsistent with meth impairment in chronic or longtime meth use, and there was evidence from which a reasonable inference could be drawn that defendant had developed a tolerance to meth.

---

[11] Defendant's expert also opined he was in the withdrawal phase at the time of the collision.

[12] The defense's expert also testified that driving either under the influence of meth or while sleepy is dangerous, and that judgment can be impaired in both the acute and the withdrawal stage of meth use.

## 2. Reckless Driving

There was also substantial evidence supporting a finding that defendant was awake at the wheel and recklessly passing vehicles when he hit Florida Zurata's car head-on.[13] Thomas Blackmore, who had a clear view of defendant crossing from the southbound lane into the northbound lane from his position as the first car traveling in the northbound lane, was a professional school bus driver for 24 years and then a driver with the City of Clovis for three years. Given his vantage point and with 27 years of experience as a professional driver, a rational jury could easily have found his testimony that defendant was passing cars at a high rate of speed more credible than the testimony of the witnesses whose views were more obstructed due to their positions on the road and whose careers did not involve logging many hours a day for years on the road as a professional driver. Indeed, Blackmore was keenly focused on defendant's truck, as Blackmore himself very narrowly escaped getting hit.

Moreover, Ramona Rodriguez, who was driving behind Florida Zurata, also testified that defendant was passing cars. Although Zurata testified at trial that defendant was not passing cars, she stated he was passing cars when she was interviewed by Officer Grotto shortly after the accident. As more than three years had passed between that interview and the trial, the jury also could well have found the statement made shortly after the accident more credible than the one made after the passage of three years.

It is unclear why Olivas's account differed from the others' accounts regarding whether there were vehicles in front of defendant and whether he passed them, but she was following behind defendant, who was driving a big truck that was lifted and had oversized tires on it. Officer Grotto testified the truck would be "tough" to see around.

---

[13] Regarding defendant's argument that he was asleep behind the wheel when the collision occurred, we observe that falling asleep does not necessarily preclude a finding of implied malice to support a second degree murder conviction. We addressed a driver asleep at the wheel and on the downside of meth in *Jimenez* and found substantial evidence of implied malice. (*Jimenez*, *supra*, 242 Cal.App.4th at p. 1357.)

In addition, her focus was on defendant's driving and she was on the phone to 911. Under those circumstances and given the strength of Thomas Blackmore's testimony, supported by Rodriguez's testimony and Zurata's prior statement, the jury could have reasonably concluded she was simply mistaken on that particular point. The assessment of witness credibility and the weighing of evidence rests within the jury's discretion and they are entitled to accept or reject testimony in whole or in part.

Finally, the data recovered from the SDM on defendant's truck supported the conclusion defendant was recklessly passing cars. In the seconds leading up to the collision, defendant was accelerating, with the throttle percentage indicating defendant was flooring the gas pedal to pick up speed. The increases in RPM, throttle percentage, and speed were clearly consistent with intentionally passing cars and although Officer Kolter could not say it was impossible for someone asleep at the wheel to depress the accelerator, the data was not consistent with defendant being asleep behind the wheel.

Although there were some inconsistencies between Pearl's and Otten's testimony, both men testified that hours before the fatal collision, defendant drove into oncoming traffic in his effort to catch up with them and both described his driving as fast, with Pearl stating defendant's actions made him afraid and Otten characterizing defendant's driving as reckless. Further, both men testified as to defendant's abnormal behavior. Pearl testified defendant was agitated and Otten testified defendant was "[v]ery angry" and behaving as Otten had observed some of his family members behave when on meth.

While there is no evidence defendant had any prior DUI-related arrests or accidents, or that he had been warned by anyone of the dangers of driving while under the influence of drugs or alcohol, as defendant argues, such evidence is not a sine non qua. (*People v. Johnigan*, *supra*, 196 Cal.App.4th at pp. 1090–1091.) "The question of implied malice is to be decided in light of all the circumstances" (*People v. Moore* (2010) 187 Cal.App.4th 937, 942) and, as another Court of Appeal observed, "'[w]hether [the defendant] was subjectively aware of the risk is best answered by the question: how

could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [the defendant] was aware of the risk.'" (*People v. Johnigan*, *supra*, at p. 1092.) The requirement that a defendant have a subjective appreciation of the risk "does not preclude drawing an inference of subjective awareness of the grave risk when the risk created is extremely high, which inference can be considered along with other circumstantial evidence to support a finding of subjective knowledge." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 843, fn. 5.)

The evidence demonstrates defendant was sufficiently self-aware to realize that some of his personal property fell from his truck and that Pearl and Otten stopped and had some form of contact with his property. He was also sufficiently self-aware at the time to follow them and he did so, driving recklessly in terms of both speed and crossing into the oncoming traffic lane in his determination to catch up to them. Approximately two hours later, defendant was again driving recklessly in terms of speed and crossing over into oncoming traffic.

Nor was defendant behind the wheel purely by happenstance. He was at the beginning of a very long, planned drive from Oakhurst to Ventura, one he embarked on despite having used meth sufficiently recently that his driving was impaired by the drug and despite having slept only one hour the previous night. One cannot avail himself of the privilege of driving on the roads while simultaneously claiming subjective unawareness of the basic rules of the road designed to ensure public safety and the dangers that accompany driving in excess of the speed limit, into oncoming traffic lanes, under the influence of drugs or alcohol, and with insufficient sleep.

In sum, the evidence shows defendant was speeding and he intentionally crossed over into the oncoming traffic lane to pass cars, behavior substantially similar to that he engaged in mere hours earlier. Defendant continued to speed forward in the wrong lane of traffic as oncoming cars approached, flooring his gas pedal. Thomas Blackmore avoided being hit head-on by virtue of swerving at the last possible moment, aided by his

23.

vantage point as the first car in the line and his decades of professional driving experience. Florida Zurata could not avoid the collision and three people lost their lives as a result of defendant's actions. There is no evidence defendant braked and his level of acceleration dropped only at the last second, consistent with him taking his foot off of the gas pedal. This engagement in a pattern of reckless driving while impaired by meth are facts from which a rational trier of fact could conclude defendant "acted with conscious disregard of the danger to human life." (*People v. Knoller*, *supra*, 41 Cal.4th at p. 156.) We therefore reject defendant's argument there was insufficient evidence to support his convictions for second degree murder.

## II. Ineffective Assistance of Counsel

Defendant bears the burden of proving ineffective assistance of counsel. (*People v. Mattson* (1990) 50 Cal.3d 826, 876–877.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that [the] defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687–694.) "[I]n assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260; accord, *People v. Stewart* (2004) 33 Cal.4th 425, 459.)

In this case, the jury sent the following note during deliberation: "In the case of a greater or lesser charge—do we have to acquit on the greater charge before we can move on to the lesser? (We disagree on the greater, but all agree on the lesser.)" After consulting with counsel and reaching an agreement, the trial court answered the question,

24.

which included directing the jury to two instructions and rereading a portion from them.[14] The jury thereafter returned verdicts convicting defendant of the lesser charges of involuntary manslaughter and resisting an executive officer, but did not complete verdicts for the greater offenses of second degree murder and resisting an executive officer by the use of force or violence.[15] As soon as the verdicts were read, defendant's counsel sought to approach and, in an unreported bench conference, notified the court of the incomplete verdicts. The trial court sent the jury back for further deliberations on the greater offenses, after which they returned verdicts convicting defendant of second degree murder and acquitting him of resisting an executive officer by the use of force or violence.

Under the doctrine of implied acquittal, "'a verdict of guilty on a lesser included offense constitutes an implied acquittal of the greater offense of which the jury could have convicted the defendant.'" (*People v. Fields*, *supra*, 13 Cal.4th at p. 299.) The trial court may direct the jury to reconsider its irregular verdict before the verdict is recorded and the jury discharged, but not after. (*Id.* at pp. 310–311.) "Thus, once the jury is discharged after rendering a verdict of guilty on the lesser included offense, without a corresponding verdict of acquittal on the greater offense, the defendant stands convicted of the lesser included offense, and retrial on the greater offense is barred .…" (*Id.* at p. 311.) The burden of bringing an incomplete verdict of conviction to the trial court's attention rests with the prosecutor. (*Ibid.*) "Placing the onus on the People to bring an incomplete verdict of conviction to the trial court's attention prior to jury discharge is

---

**14** CALCRIM No. 642, entitled "DELIBERATIONS AND COMPLETION OF VERDICT FORMS: FOR USE WHEN DEFENDANT IS CHARGED WITH SECOND DEGREE MURDER AND JURY IS GIVEN NOT GUILTY FORMS FOR EACH LEVEL OF HOMICIDE," and CALCRIM No. 3517, entitled "DELIBERATIONS AND COMPLETION OF VERDICT FORMS: FOR USE WHEN LESSER INCLUDED OFFENSES AND GREATER CRIMES ARE NOT SEPARATELY CHARGED (NON-HOMICIDE)."

**15** The jury did not indicate it was deadlocked on the greater offenses. (*People v. Fields*, *supra*, 13 Cal.4th at pp. 303, 305.)

appropriate because it preserves the possibility that, after reconsideration pursuant to section 1161, the jury will decline to return the requisite verdict of acquittal of the greater offense.  Should this occur, the incomplete verdict of conviction on the lesser included offense initially rendered by the jury is of no effect, and the prosecutor may move the trial court to declare a mistrial, discharge the jury, and set the entire matter for retrial.  [Citations.]  Alternatively, when faced with a deadlock on the greater offense and a verdict of guilt on the lesser included offense, the People may prefer to forgo the opportunity to convict the accused of the greater offense on retrial in favor of obtaining a present conviction on the lesser included offense." (*Ibid.*)

Had the jury's irregular verdict in this case as it stood initially been recorded and the jury discharged, defendant would have stood convicted of three counts of involuntary manslaughter and impliedly acquitted of the second degree murder counts, with retrial barred.  (*People v. Fields*, *supra*, 13 Cal.4th at pp. 299, 311.)  Defendant argues his counsel rendered ineffective assistance of counsel by informing the trial court of the incomplete verdicts of conviction, given the burden rested with the prosecutor.  Defendant contends there is no tactical explanation for counsel's conduct and as a result of counsel's action, he was convicted of second degree murder.  The People respond that counsel could reasonably have thought the jury neglected to sign the forms acquitting his client and "as a matter of common sense, counsel cannot be deemed incompetent for being forthright with the court."

"'[A]n appellate court's ability to determine from the record whether an attorney has provided constitutionally deficient legal representation is in the usual case severely hampered by the absence of an explanation of an attorney's strategy.'" (*People v. Johnson*, *supra*, 62 Cal.4th at p. 653.)  "'In some cases … the record on appeal sheds *no* light on why counsel acted or failed to act in the manner challenged.  In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on

appeal.'" (*People v. Bell* (1989) 49 Cal.3d 502, 546, italics added.) "The merits of such claims are more appropriately resolved, not on the basis of the appellate record, but rather by way of a petition for writ of habeas corpus." (*People v. Johnson*, *supra*, at p. 653; accord, *People v. Salcido* (2008) 44 Cal.4th 93, 172.)

In this case, we are left to speculate as to counsel's motive. The trial court record "sheds no light on why trial counsel acted as he did; he was not asked to explain his performance; [and] although we may doubt that a satisfactory explanation could be provided, we are unable to conclude that it could not." (*People v. Bell*, *supra*, 49 Cal.3d at p. 546; *People v. Johnson*, *supra*, 62 Cal.4th at pp. 653–654.) For this reason, we find defendant's claim is more appropriately resolved by writ of habeas corpus and we reject his challenge on direct appeal.

## DISPOSITION

The judgment is affirmed.

_____
KANE, J.

WE CONCUR:


_____
HILL, P.J.


_____
SMITH, J.

27.